Leroy **GATES, individually and on behalf of all other members of Local 14–14B International Union of Operating Engineers, Plaintiff,**

v.

Ralph **DALTON, as President, et al., Defendants.**

No. 73 C 375.

United States District Court, E. D. New York.

July 8, 1975.

⊛─184

Burton H. Hall, New York City, for plaintiff.

Doran, Colleran, O'Hara, Pollio & Dunne, P. C., Garden City, N. Y., by Robert A. Kennedy, Alan J. Reardon, Garden City, N. Y., for defendants.

## MEMORANDUM AND ORDER

NEAHER, District Judge.

In this action brought under the Labor-Management Reporting and Disclosure Act of 1959 ("the LMRDA"), 29 U.S.C. § 401 *et seq.*, plaintiff, Leroy Gates, claims that the defendant labor organization and its officers infringed his rights in violation of § 101(a)(3)(A) of the LMRDA, 29 U.S.C. § 411(a)(3)(A),[1] by increasing certain "dues"

---

1. The pertinent portion of subsection (a) of § 411, the bill of rights of members of labor organizations, provides:

"(3) Dues, initiation fees, and assessments.—Except in the case of a federation of national or international labor organizations, the rates of dues and initiation fees payable by members of any labor organization in effect on September 14, 1959 shall not be increased, and no general or special assessment shall be levied upon such members, except—

"(A) in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing voting at a general or special membership meeting, after reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot;"

The court's subject matter jurisdiction, although not properly pleaded in the complaint, is found in § 102 of the LMRDA, 29 U.S.C. § 412:

"Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchap-

and "contributions," without giving "the [union] membership reasonable notice of the intention to vote on such question."[2] The complaint seeks declaratory relief invalidating the increases, an injunction restraining future collection, reimbursement, costs and attorney's fees. Plaintiff sues individually and on behalf of all other members of Local 14–14B, International Union of Operating Engineers ("Local 14–14B") similarly situated.

The case is before the court on defendants' motion for summary judgment and plaintiff's motion for class action certification. These are treated in detail below, following a brief summary of the pertinent facts as reflected in the supporting affidavits and depositions.

## I.

Local 14–14B, a local union chartered by the International Union of Operating Engineers since 1936, consists of two distinct groups: Local 14, New York City-licensed operators of hoisting and lifting equipment, and Local 14–b, mostly unlicensed operators of the same equipment in areas where no license is required. The two groups meet and vote together as one local, and the combined membership total is approximately 1500–1600 men. Gates has been a member of Local 14–14B since 1949.

Prior to 1969, members such as Gates paid fixed monthly dues. In order to meet the financial needs of Local 14–14B, the local's Executive Board sought and obtained approval from the membership at a meeting during 1969 to supplement the local's income with a work assessment from the membership. At the same time the members expressed their approval of the Executive Board's desire to seek a noncontributory annuity plan from employers for the benefit of union members. Subsequent negotiations with the various employer associations resulted in such a plan, as well as a ten-cent per hour dues check-off for the benefit of Local 14–14B. No question is presented concerning the validity of these negotiations.

In the spring of 1972 the Executive Board decided to seek an increase of five cents an hour in the work assessment from the membership. According to Thomas J. Nolan, Business Manager and Financial Secretary of Local 14–14B, the need for the increase arose out of the purchase and renovation of a building in Queens to which the union ultimately moved its headquarters in the fall of 1972. The decision to take the question to the members was apparently made at some point after the May but before the June regularly scheduled monthly meeting of Local 14–14B.[3] It appears undisputed that the next such meeting was scheduled for Friday, June 9, 1972.

At this point the facts sink into controversy. Nolan swears in his affidavit that he prepared a letter in late May to be sent to the membership informing them about the need for the increase and that the matter would be voted upon

ter may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate. Any such action against a labor organization shall be brought in the district court of the United States for the district where the alleged violation occurred, or where the principal office of such labor organization is located."

2. Complaint, ¶¶ 6, 7.

3. Article XXIII, Subdivision 10, Section (a) of the constitution of the International Union of Operating Engineers states:

"All Local Unions shall have at least one regular meeting each month, except that a Local Union may dispense with monthly meetings during a vacation period, not to exceed three successive months in one calendar year. Local Unions may also hold as many other regular meetings as may be necessary for the proper transaction of business."
More particularly, Article III, Section 1, of the by-laws of Local 14–14B states:
"The regular meetings of this Local Union shall be held on the second Friday of each month and at such time and place as the Local Union may designate."

at the June 9th meeting. Gates maintains he never received any such notice, because it was never sent to the membership. Despite a search of union records, defendants have been unable to produce a copy of the letter. Although the reasons for defendants' failure to find a record of the letter are explored at some length in the papers, the ultimate fact—whether actual notice in the form of a letter to individual union members was sent out prior to the June meeting—is not expressly confirmed in the affidavit of Elizabeth C. Gowan, the person who would have performed that secretarial chore.

In the union newspaper, *The Record*, for June 1972 the following meeting notice appeared: "GENERAL MEETING Friday, June 9th, 8 P.M." [4] According to Nolan, however, even this general newspaper notice was, at best, not mailed out to the membership until one or two days before the meeting.

On June 9th, Gates attended the meeting unaware of the impending vote, at which it was announced that the vote was to be taken. Nolan explained the purpose of the increase in the work assessment. Thereafter secret ballots were cast and the proposal passed by a vote of 232 to 24. But even this seemingly mechanical process is embroiled in factual controversy. Gates recollects that only because of his objection were secret ballots used instead of a voice vote. He also states that ballots stating the question to be voted upon were not used, but only ones with the curious choices "guilty" or "not guilty." Further, the question actually voted upon, according to Gates, was not simply the work assessment increase, but a single question combining that proposal with one to negotiate a thirty-cent increase in

the annuity fund at the same time. This view of the question presented to the membership is borne out by the earlier testimony of Nolan.[5]

On the other hand, defendants now seek to minimize Nolan's recollection then as "poor," relying on a subsequently found sample ballot which purports to show that the work assessment increase was presented as an isolated question on a single yes/no ballot, and on the minutes of the meeting, whose language tracks the ballot.[6] Defense counsel has attempted to buttress this argument by, of all things, his own sworn statement that he "prepared the language contained in the ballot," and "can assure this Court that only the single issue was presented." [7]

Following the June 1972 meeting, negotiations for the implementation of the votes taken were included in the collective bargaining that was underway in anticipation of the expiration of existing agreements on June 30, 1972. The wage package finally agreed upon involved three $.35 an hour increases, one every six months commencing July 1, 1972. The second increase [8] was to be in the form of a $.30 an hour contribution to the annuity plan, plus a $.05 an hour wage increase which would go directly to the union as the increase in the work assessment check-off. When the proposed contracts were submitted to the Construction Industry Stabilization Committee (CISC), however, the second increase was reduced from $.35 to $.25. By voice vote at the November 10, 1972, regular membership meeting, the CISC reduction was approved in the form of a $.10 reduction in the annuity plan contribution, while the $.05 work assessment increase was preserved.

4. Wallace Aff., Exh. E.   See Gates Dep., April 3, 1974, at 41, 43.

5. Nolan Dep., June 14, 1973, at 11, 21–22. See Gates Dep., *supra*, at 12–14.

6. See Gowan Aff., Exh. A ; Nolan Aff., Oct. 2, 1973, Exh. C.

7. Kennedy Aff., ¶ 6.

8. *I. e.*, the one scheduled for implementation January 1, 1973.

After plaintiff commenced this lawsuit in March of 1973, the union took steps to ratify the prior vote. Nolan prepared a letter to the membership which briefly set out the nature of the litigation and notified them that there would "be a discussion and secret ballot vote on the additional 5¢ dues check-off at the August 10, 1973 regular monthly meeting. . . ." [9]  At the meeting, by a vote of 217 to 31, the $.05 increase in the work assessment was "readopted and reratified" by the membership.[10]  There is no dispute here about the prospective validating effect of that vote as of August 10, 1973.

## II.

■   With that background, the inappropriateness of summary judgment in this case quickly becomes clear.  The central legal question is what constitutes "reasonable notice," under 29 U.S.C. § 411(a)(3)(A), "of the intention to vote upon such question," i. e., an increase in dues or the levy of a special or general assessment.  There is no question that, at least when initially put to the membership in June of 1972, the proposed increase was one within the protection of the notice provisions of § 411(a)(3).

Plaintiff contends individual written notice of the particular question to be voted upon is required under the Act; defendants concede that if this be so, there is a material issue of fact whether such notice in fact was distributed, which precludes summary judgment. But defendants argue that individual written notice is not required, and that since the June 1972 vote was taken at a regularly scheduled meeting, actual notice of which was published in the union newspaper, and constructive notice of which was present by virtue of the availability to all members of Local 14–14B's by-laws, this constitutes sufficient reasonable notice under the statute.

■■   On its face, the statute does not require individual written notice, nor is such an express requirement to be readily inferred from the LMRDA's legislative history.[11]  But Congress' own enacted declaration of findings, purposes and policy underlying the LMRDA express concern with "instances of breach of trust, corruption, disregard of the rights of individual employees, and other failures to observe high standards of responsibility and ethical conduct . . . ."  29 U.S.C. § 401(b).  More to the point, the LMRDA was designed "to insure union democracy." [12]  With that

9. Nolan Aff., Oct. 2, 1973, Exh. D.

10. *Id.*, ¶ 18 & Exh. E.

11. See S.Rep.No.187, 86th Cong., 1st Sess. (1959), in 2 U.S.Code Cong. & Admin. News, p. 2318 (1959).  The report does not elaborate on the concept of notice.  In general terms Congress stated its "philosophy of legislative restraint":

"The bill does not spell out in detail all the standards which every trade union should follow.  It recognizes the variety of situations to which its provisions must apply and, especially, the inadvisability and injustice of compelling unions to conform to a uniform statutory rule with respect to unimportant details of administration." *Id.* at 2324.

12. *Id.* at 2318.  See *American Federation of Musicians v. Wittstein*, 379 U.S. 171, 85 S. Ct. 300, 13 L.Ed.2d 214 (1964).  As the Second Circuit noted in *Navarro v. Gannon*, 385 F.2d 512, 518 (2 Cir. 1967) :

"The LMRDA was enacted with the clear purpose of assuring 'the full and active participation by the rank and file in the affairs of the union.'  *American Federation of Musicians v. Wittstein*, 379 U.S. 171, 182–183, 85 S.Ct. 300, 307, 13 L.Ed. 2d 214 (1964).  The Congress by passing a 'Bill of Rights' for union members determined that the efficiency of a monolithic union under autocratic rule was gained at too great a price if it necessitated any sacrifice in the members' rights to determine the course of their organization. The balance was struck in favor of union democracy.  Only a union responsive to the rights of all its members can achieve the ideals of responsibility, opportunity and self-determination that are recognized as fundamental values in the labor movement.

"To effectuate that determination, the Bill of Rights was incorporated into the Act, guaranteeing each union member pro-

in mind, it seems quite clear that a notice required under § 411(a)(3) is not "reasonable" unless it descends to particulars, and the ordinary union member, attentive to the interests he has at stake in such a situation, is, in some manner, thereby made aware of the specific issue to be voted upon a reasonable time in advance of the meeting.

Under this standard, defendants' reliance on the notice of the regularly scheduled meeting, whether actual or constructive, is misplaced. Neither the newspaper notice nor the by-law notice warns the membership about the vote to be taken, or gives them time to reflect on the merits of the proposal, independently investigate it, or mount effective support for or opposition to it. Since on this record no evidence appears of any attempt other than the disputed letter to notify members of the vote to be taken at the June 1972 meeting, whether such notice went out is a material issue of fact precluding summary judgment.

A further bar to summary judgment is the evidence which suggests the actual dues increase was first approved only in the context of a compound question violative of § 411(a)(3)(A).[13] If Gates' and Nolan's recollections as described above are accurate, the additional proposal might have been thought so advantageous to the

members that it rendered much more likely the approval of the increase in the work assessment. Similar compound questions have been held to violate the member's rights under the statute "to vote 'yes' or 'no' without coercion," and to a "meaningful vote on increases in dues or assessments." *Sertic v. Cuyahoga, Lake, Geauga and Astabula Counties Carpenters District Council of the United Brotherhood of Carpenters and Joiners of America,* 423 F.2d 515, 521 (6 Cir. 1970).[14]

Finally, there is the question of the effect of subsequent events on the vote in June 1972. Two observations will quickly dispose of this issue. First, assuming *arguendo* the June 1972 vote to be invalid and void, it could not be retroactively cured by subsequent ratification in August 1973. *Peck v. Associated Food Distributors of New England,* 237 F.Supp. 113, 115 (D.Mass. 1965); *Local No. 2, International Brotherhood of Telephone Workers v. International Brotherhood of Telephone Workers,* 362 F.2d 891, 896 (1 Cir. 1966). If otherwise valid, the subsequent vote is effective only prospectively. *Id.* Secondly, and again assuming the invalidity of the June 1972 vote, the November 1972 meeting could not operate to cure the defect before the dues increase went into effect in January 1973, as it appears undisputed that the vote taken at that

---

tection against infringement of his rights to vote, to meet, and to participate in discussions on matters of concern to him and his union. These rights are protected against incursion or subversion by the individual's own representatives, the officers of his union."

13. While this claim does not appear on the face of the pleadings, as defendants note, the question of a combined vote apparently surfaced during depositions taken after the complaint was filed. Defendants, moreover, have responded to the claim on the merits on this motion. Thus, an amendment of the pleadings under Rule 15(a), F.R.Civ.P., would work no injustice. 3 Moore's Federal Practice ¶ 15.08[3] at 888 n. 5 (2d ed. 1974).

14. *Sertic* has been somewhat restricted in this circuit in *Sheldon v. O'Callaghan,* 497 F.2d 1276 (2 Cir. 1974), wherein it was held, despite general agreement with the *Sertic* principles, that the union was not required "to submit for a separate vote each of the many interrelated provisions of the proposed new constitution," *id.* at 1280, which included, *inter alia,* various changes in the union dues structure and dues increases for more than half of the members. *Id.* at 1278. See also *Blanchard v. Johnson,* 388 F.Supp. 208, 213–14 (N.D.Ohio 1974); *Ford v. Metropolitan District Council of Philadelphia and Vicinity of the United Brotherhood of Carpenters and Joiners of America,* 323 F. Supp. 1136, 1138–39 (E.D.Pa.1970).

meeting was a voice vote, whereas the statute unambiguously requires a secret ballot for any dues increase. *Connor v. Highway Truck Drivers and Helpers, Local 107,* 378 F.Supp. 1069, 1973–74 (E.D.Pa.1974); *White v. Local No. 207 of the Laborer's International Union of North America,* 387 F.Supp. 53, 56 (W. D.La.1974). In sum, the events subsequent to June 9, 1972, are largely immaterial.

This lawsuit reduces itself to a single question—whether or not a notice was sent out to the membership just prior to the June 1972 meeting. Upon that material factual question hinges the validity of the dues increase for the entire period from January 1, 1973 until August 10, 1973. Summary judgment must therefore be denied. See, *e. g., Tucker v. Local 70 Bartenders' Union of Brooklyn and Queens,* 236 F.Supp. 233 (E.D. N.Y.1964).

### III.

There is no question that a class action may be maintained for violation of § 411 in connection with union dues increases. *White v. Local No. 207, supra,* 387 F.Supp. at 54; *Rota v. Brotherhood of Railway, Airline and Steamship Clerks,* 64 F.R.D. 699, 706 (D.N.Ill. 1974); *Connor v. Highway Truck Drivers, supra,* 378 F.Supp. at 1075. See *Sertic v. Cuyahoga, supra,* 423 F.2d at 521–22; but cf. *Ford v. Metropolitan District Council, supra,* 323 F.Supp. at 1140–41.

According to the complaint, plaintiff brings suit on behalf of himself and "all the members of Local 14–14B, similarly situated, a class too numerous to be individually named." [15] In seeking class action status, plaintiff has the burden of showing that all prerequisites of class action treatment are present: (1)

the existence of a class; (2) his membership in it; (3) existence of the four prerequisites in Rule 23(a), F.R.Civ.P.; and (4) a demonstration that the action falls within at least one of the categories of Rule 23(b). 7 Wright & Miller, Federal Practice and Procedure § 1759 at 578–79 (1972). Out of these several requirements, it seems clear the first three prerequisites of Rule 23(a) are met; the controversy here has essentially been narrowed to three issues, discussed in turn below.

### A. Class Definition

Although the complaint speaks only in terms of representing "members" of Local 14–14B, in his motion papers plaintiff clearly seeks to include in his class all persons "adversely affected by the unlawful dues increase," [16] and thereby include in the class "permitmen who are subject to the assessment at issue, approximately 300 in number." [17] It is none too clear on this record exactly what a "permitman" is, although it appeared from statements made on oral argument that the term applied to persons working out of the local who were not members but worked by permit issued by the local. But whatever arrangement may exist in fact with respect to permitmen, it is clear that the terms "members" and "members in good standing," as used in reference to a local labor organization in § 411(a)(3)(A), mean persons who have "fulfilled the requirements for membership in such organization . . .", 29 U.S.C. § 402(*o*). This definition applies to non-members as well as actual members of the local, but non-members who have not fulfilled those requirements have no protection under 29 U.S.C. §§ 411, 412, and the LMRDA does not limit the previously recognized rights of unions to choose their own members.[18] It is likewise not

---

15. Compl. ¶ 2.

16. Pl. Memo. of Law at 19.

17. Pl. Answer to Defs.' Interrogatory 3(d).

18. See *Parish v. Legion,* 450 F.2d 821 (9 Cir. 1971); *Moynahan v. Pari-Mutuel Employees Guild of California, Local 280,* 317 F.2d 209, 210 (9 Cir.), *cert. denied,* 375 U.S. 911, 84

clear how many, if any, of the 300 permitmen have a federal cause of action. Plaintiff, without detailing the arrangement, states that the permitmen "are required to pay a permit fee based upon the prevailing dues structure." [19]

■ Under these circumstances, absent an allegation of pendent jurisdiction over any non-federal claims such permitmen may have under State law, and absent a named plaintiff asserting such non-member, non-federal rights, it seems appropriate to restrict the class exclusively to those who can assert a federal claim: i. e., persons adversely affected by the dues increase during the period in question who are either members of Local 14–14B or non-members who meet the local's membership requirements.

### B. *Antagonism*

■ The requirement that the interests plaintiff assert not be antagonistic or conflicting with those of the purported class arise out of prerequisites (3) and (4) to Rule 23(a), F.R.Civ.P.[20] In an attempt to show these requirements are not met, defendants make much of the votes taken at the various meetings for the dues increases. In their view they reflect substantial class disapproval of this lawsuit as "unfounded or unnecessary and, at the very least, not in accord with the best interests of the

Local." [21] They also point to the failure of other members of Local 14–14B to intervene or express interest in the suit, and the financial problems that would be caused for the union and the members by the reimbursement of an estimated $92,400 in collected assessments.[22]

■ Case law on the troublesome antagonism question, extensively briefed and argued here, has led to widely divergent results, depending on the factual setting of the case. A few general principles of relevance, however, have emerged. A finding of antagonism sufficient to preclude a truly representative action by plaintiff may be based on any of a number of different factors, but in every case the conflict must be "genuine," *Madonick v. Denison Mines Limited*, 63 F.R.D. 657, 658–59 (S.D.N.Y. 1974), and must go to the heart of the controversy. It has often been stated that the "antagonism must be as to the subject matter of the suit." *Redmond v. Commerce Trust Co.*, 144 F.2d 140, 151 (8 Cir.), *cert. denied*, 323 U.S. 776, 65 S.Ct. 187, 89 L.Ed. 620 (1944). See 3B Moore's Federal Practice ¶ 23.07[3]; 7 Wright & Miller, Federal Practice and Procedure, *supra*, § 1768.

■ The essence of this controversy is clearly the protection of federally-secured rights of union members and redress for their infringement. Defendants' suggestions of antagonism, even if

---

S.Ct. 207, 11 L.Ed.2d 150 (1963); *Hughes v. Local No. 11 of International Association of Bridge, Structural and Ornamental Ironworkers, AFL–CIO*, 287 F.2d 810 (3 Cir.), *cert. denied*, 368 U.S. 829, 82 S.Ct. 51, 7 L. Ed.2d 32 (1961); *Vincent v. Plumbers & Steamfitters Local No. 198*, 384 F.Supp. 1379, 1382–83 (M.D.La.1974); *Philipchuk v. International Association of Bridge, Structural and Ornamental Ironworkers*, Civil No. 208–70 (D.N.J.Feb. 16, 1972), *aff'd*, 475 F. 2d 1396 (3 Cir. 1973); *Axelrod v. Stoltz*, 264 F.Supp. 536, 539 (E.D.Pa.1967), *aff'd*, 391 F.2d 549 (3 Cir. 1968); *Stone v. Local 29, International Brotherhood of Boilermakers, Iron Shipbuilders, Blacksmiths, Forgers and Helpers*, 262 F.Supp. 961 (D.Mass. 1967).

19. Pl. Memo. of Law at 19.

20. Rule 23(a) provides:
"(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

21. Def. Memo. of Law at 18.

22. Nolan Aff., ¶ 9 (July 12, 1974).

accepted at face value, in no way establish that the members of Local 14–14B are antagonistic to continued preservation and protection of their bill of rights under 29 U.S.C. §§ 411, 412. See *Connor v. Highway Truck Drivers, supra,* 378 F.Supp. at 1075; *Flaherty v. McDonald,* 178 F.Supp. 544, 550–51 (S.D. Cal.1959). But that is only the beginning of the inquiry, because one factor which has been found to be a sufficient, genuine conflict is that the relief sought "is different from what the rest of the proposed class would want." [23]

Of the relief plaintiff seeks, it is clear that subsequent membership action has mooted his claim for an injunction. Additionally, among the other requests for relief, the appropriate approach to the reimbursement claim is not entirely clear. *Connor v. Highway Truck Drivers, supra,* 378 F.Supp. at 1075–76; *Rota v. Brotherhood of Railway, Airline and Steamship Clerks, supra,* 64 F.R.D. at 707.[24] Plaintiff characterizes this action as having been "brought predominantly for injunctive and declaratory relief." [25]

Defendants' evidence of antagonism over the relief sought is essentially that: (1) the August 1973 vote of the membership to validate retroactively the dues increase shows the members are opposed

to reimbursement; (2) the failure of other class members to join in the lawsuit fortifies this conclusion; and (3) the economic harm visited on the union by the institution of this action, and the even greater harm its successful prosecution would cause, is not in the best interests of the local and hence, the class as a whole. These arguments simply do not withstand close scrutiny.

Whether or not others have intervened in the action is considered irrelevant to the issue of adequacy of representation. *Green v. Wolf Corporation,* 406 F.2d 291, 298 (2 Cir. 1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969); *Eisen v. Carlisle & Jacquelin,* 391 F.2d 555, 563 (2 Cir. 1968) (Eisen II). See 7 Wright & Miller, *supra,* § 1768 at 650. Equally irrelevant are the union's expenditures in defense of the action. There is no doubt plaintiff could have sued individually on his federal cause of action, and whether other members think the suit unwise or unfounded cannot change that fact. Hence the only genuine dispute centers about the fact that court-ordered reimbursement might, as evidenced by the August 1973 vote, be opposed by a majority of the class. This is a realistic possibility, if reimbursement would work a hardship, because once reim-

23. *Madonick v. Denison Mines Limited, supra,* 63 F.R.D. at 659. See Note, Class Actions: Defining the Typical and Representative Plaintiff Under Subsections (a)(3) and (4) of Federal Rule 23, 53 B.U.L.Rev. 406, 422–24 (1973). In view of the inadequate factual basis for concluding that antagonism over the relief has been shown, see discussion, *infra,* it is unnecessary to consider the applicability of the *Madonick* rule to a § 411 case such as this.

24. One court has suggested that it is for the members of the union to decide, according to the Union constitution and by-laws, what disposition to make of funds illegally assessed under § 411. *Sertic v. Cuyahoga, supra,* 423 F.2d at 522; but see *id.,* 459 F.2d 579 (6 Cir. 1972) (on appeal after remand). In *Peck v. Associated Food Distributors, supra,* Judge Wyzanski held that a dues increase unlawfully collected under protest is

"plainly returnable," and even for those who did not protest seasonably, "[a]ll the excesses wrongfully collected are repayable." 237 F.Supp. at 115. See also *Local 2, International Brotherhood of Telephone Workers v. International Brotherhood of Telephone Workers,* 295 F.Supp. 1178, 1179 (D.Mass. 1969).

25. Pl. Memo. of Law at 12. In his affidavit, plaintiff's counsel adds that:
"the suit is still one for declaratory judgment, declaring the method by which the dues increase was adopted unlawful, and secondarily for return of moneys wrongfully received as payment of such unlawful dues increase—and the former relief, judged by public policy and by the considerations that have been advanced by plaintiff, is plainly primary and predominant." Hall Aff. ¶¶ 5, 8 (Aug. 24, 1974).

bursement is ordered, the union may not transparently circumvent and frustrate such court-ordered reimbursement. *Local 2, International Brotherhood of Telephone Workers · v. International Brotherhood of Telephone Workers, supra,* 295 F.Supp. at 1180.

On this record the evidence of such antagonism is far from clear. The union's financial capability to make a refund is not spelled out in detail, nor is the source of the $92,400 figure given. All that is stated is that

> "[i]n order to raise the cash to repay the members of the Local, it would be necessary for us to either increase the mortgage on our building or further increase the wage assessment. Either course of action would be detrimental to the members of the Local and would greatly diminish the Local's ability to serve its members." [26]

■ Although these conclusory facts are not directly disputed, the court will not lightly assume that the members are in complete agreement with the union's management about this. Moreover, in circumstances presented by a case such as this, once plaintiff has established his entitlement to the protection of 29 U.S.C. §§ 411, 412, and states an adequate claim thereunder, defendants' evidence of antagonism by contrary membership votes should be nothing short of clear and convincing. To hold otherwise would leave the way open for frustration of full vindication of federally-secured rights and insulation of union managèment from adequate correction of the abuses which prompted enactment of the LMRDA. If plaintiff can prove his claim of lack of notice, it would render suspect the fairness of the union-sponsored presentation at the August 1973 meeting as well as the conclusion that

the vote truly reflects the informed wishes of the membership. See *Blanchard v. Johnson, supra,* 388 F.Supp. at 213–14.

On the facts, the numerical vote for the union proposal at that meeting ($\frac{7}{8}$ths of the voting members present) does not establish a clear conflict, for only about $\frac{1}{8}$ of the membership actually attended the meeting. Additionally, it is not at all clear that the membership as it existed at the August 1973 meeting is coextensive with the class defined above. About the most that can be safely said now is that some portion of the class might well be opposed to the relief sought. Following notice to the class, if this group proves substantial, an order establishing subclasses under Rule 23(c)(4), F.R.Civ.P., may be appropriate, or possibly other modifications of the class action order, which could include revocation of class action status. *Feder v. Harrington,* 52 F.R.D. 178, 182 (S.D.N.Y.1970); 7A Wright & Miller, *supra,* § 1785 at 137.

■ For the present, the court is satisfied that the principal thrust of Gates' efforts on behalf of his fellow members is to establish the existence of a violation of the concept of union democracy and fair dealing embedded in federal law and to prevent its recurrence in Local 14–14B. His efforts have been substantial and continuing. There is no basis for presently concluding he is an inadequate representative of the class.[27]

## C. *Notice and the Type of Class Action*

■ The parties have made much of the issue of whether this is a (b)(2) or (b)(3) class action under Rule 23. This grows out of their belief, not without solid foundation, that although individual notice is required in a (b)(3) action

---

26. Nolan Aff. ¶ 9 (July 12, 1974).

27. See *Connor v. Truck Drivers, supra,* 378 F.Supp. at 1075; *Flaherty v. McDonald, supra,* 178 F.Supp. at 550–51; cf. *Cortright v. Resor,* 325 F.Supp. 797, 807–08 (E.D.N.Y.),

*rev'd on other grounds,* 447 F.2d 245 (2 Cir. 1971). But see *Ford v. Metropolitan District Council, supra,* 323 F.Supp. at 1140–41; *Giordano v. Radio Corporation of America,* 183 F.2d 558 (3 Cir. 1950).

under (c)(2) of Rule 23, *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S. Ct. 2140, 40 L.Ed.2d 732 (1974), it is not mandatory in a (b)(2) action. *Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 556 n. 4, 42 L.Ed.2d 532 (1975); *Frost v. Weinberger,* 515 F.2d 57 (2 Cir. 1975).

Defendants concede that this action falls at least within the (b)(3) category. There can be no doubt that common questions of the class predominate here and that a class action is the best available method to fairly and efficiently adjudicate the alleged infringement of the rights of the class as a whole. But between the filing of the action and the motion for certification, the need for injunctive relief was, of course, mooted by the August 1973 vote. Were injunctive relief still available, this action could be considered one where "final injunctive relief or corresponding declaratory relief with respect to the class as a whole" is appropriate. Rule 23(b)(2), F.R.Civ.P. *White v. Local No. 207, supra,* 387 F. Supp. at 54–55; *Rota v. Brotherhood of Railway, Airline and Steamship Clerks, supra,* 64 F.R.D. at 706–07; *Connor v. Highway Truck Drivers, supra,* 378 F. Supp. at 1075. Whether the court should go further and accept plaintiff's contention that the action may still be so considered because defendants' own action allegedly obviated the need for injunctive relief is a much closer question. See *Arkansas Education Association v. Board of Education of Portland, Arkansas School District,* 446 F.2d 763, 768–69 (8 Cir. 1971); 1966 Advisory Committee's Notes to Amendments to Rule 23(b)(2).

The court will not reach this issue because, in view of the reimbursement claim, notice to the class and an opportunity to "opt-out" must be provided in any event. That, as noted, is the only real practical difference between the two designations, 3B Moore's Federal Practice ¶ 23.45[1] at 23–703, so plaintiff is not prejudiced by a (b)(3) designation.

Notice will also assist the court in ensuring there is fair and adequate representation of the class. Notice for that purpose is available in any type of class action under the provisions of Rule 23(d)(2). 7A Wright & Miller, *supra,* § 1793. Notice which fairly apprises absent class members of the nature of this action, and provides each with an opportunity to either intervene or request exclusion from the class, and to signify whether he considers the representation fair and adequate, should remove any lingering doubts about the antagonism issue, as discussed above. See *Knuth v. Erie-Crawford Dairy Cooperative Association,* 395 F.2d 420, 428–30 (3 Cir. 1968); 7 Wright & Miller, *supra,* § 1768 at 651.

The mechanics of giving notice need not be discussed at length. The court will require plaintiff to draft an appropriate notice consistent with the foregoing, with defendants afforded an opportunity to respond. It is clear plaintiff must bear the cost of notice "as part of the ordinary burden of financing his own suit." *Eisen v. Carlisle & Jacquelin, supra,* 417 U.S. at 179, 94 S.Ct. at 2153. It is also clear that nothing in *Eisen* prohibits minimization of those costs to plaintiff in circumstances where, as here, the defendants appear to be already in regular communication with most, if not all, the class members. If it would operate to give adequate notice at minimum cost, plaintiff should be allowed to explore the possibility of using, at his own expense, those established lines of communication. See *Rota v. Brotherhood of Railway, Airline and Steamship Clerks, supra,* 64 F.R.D. at 707. Refinement of these details is left to the parties in the first instance.

To summarize the court's conclusions, all outstanding motions must be denied except that the court will certify this action as a class action pursuant to Rule

23(b)(3), F.R.Civ.P., the class to be as defined above. Notice is to be sent to known class members as soon as practicable following court approval of the form and manner of delivery of notice. The parties should attempt to agree upon the details of such notice, consistent with the foregoing opinion, and submit their proposal or proposals to the court within thirty (30) days of the date of this order.

So ordered.