Robert J. McGINNIS, et al.,
Plaintiffs-Appellants,

v.

LOCAL UNION 710, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, a labor organization, Defendant-Appellee.

No. 84–2723.

United States Court of Appeals,
Seventh Circuit.

Argued May 23, 1985.

Decided Sept. 25, 1985.

Rehearing and Rehearing En Banc
Denied Nov. 5, 1985.

Thomas H. Geoghegan, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiffs-appellants.

Marvin Gittler, Asher, Pavalon, Gittler & Greenfield, Chicago, Ill., for defendant-appellee.

Before CUMMINGS, Chief Judge, WOOD, Circuit Judge, and WYATT, Senior District Judge.*

CUMMINGS, Chief Judge.

This action seeks an order requiring Local 710, International Brotherhood of Teamsters ("Local 710" or "the Union") to provide its remotely situated members with regional meetings or mail ballots for voting on amendments to the bylaws of the Union. Plaintiffs, four members of Local 710, assert that the Union's policy of requiring its members to attend meetings in Chicago in person to vote on amendments to Local 710's "Constitution and By-Laws" (hereinafter "By-Laws") violates their rights of equal voting privileges and of free speech and assembly guaranteed under Title I, § 101(a)(1) and (2) of the Labor Management Reporting and Disclosure Act (LMRDA), 29 U.S.C. § 411(a)(1) and (2). The district court granted defendant's motion for dismissal, construing it as a motion for summary judgment, ruling that plaintiffs complained of a purely internal union matter and had failed to state a claim under Title I of the LMRDA. For the reasons set forth below, we reverse the judgment and remand with instructions.

---

* The Honorable Inzer B. Wyatt, Senior District Judge of the Southern District of New York, is sitting by designation.

## I.

Plaintiffs filed this action on November 29, 1983, after exhausting all internal Union remedies, pursuant to § 102 of the LMRDA, 29 U.S.C. § 412, which provides that any person whose rights secured by Title I of the Act have been infringed by a violation of Title I "may bring a civil action in a district court of the United States for such relief (including injunctions) as may be appropriate." The alleged violation of Title I is the Union's requirement of personal attendance at a single meeting location in Chicago to vote on proposed amendments to Local 710's By-Laws.

The action arises out of the unsuccessful attempt of certain Local 710 members to amend the Union By-Laws to require direct election of union stewards. (Complaint ¶ 10, R. Item 1). Prior to the April 24, 1983, bylaw amendment vote concerning union stewards, alternative voting procedures were requested by plaintiffs and others but these requests were denied by the Union leadership.

Article 33 of Local 710's By-Laws provides that:

Any 10 members may propose in writing amendments to these By-Laws. The proposed amendments, unless otherwise provided herein, shall be submitted to the Local Union and read at one regular meeting and voted upon at the next regular meeting. Amendments may also be proposed, read and voted upon at a special meeting called for such purpose with advance notice to the membership of the nature of the amendment. Amendments approved by a two-thirds (⅔) vote of those members present and voting shall be sent to the Office of the General President for approval and shall take effect immediately upon receipt by the Local Union of such approval.

Article 18, Section 1 of the By-Laws requires general membership meetings to be held monthly at a place designated by its Executive Board. Section 2 of the same Article permits special meetings to be called by the President or a majority of the Executive Board after ten percent of the members sign a petition requesting such a meeting. Regional membership meetings are expressly authorized by Article 8, Section 1, which states:

The Executive Board is authorized to permit membership meetings to be held on a division, craft, place of employment or other similar basis as it shall consider appropriate considering the special needs of the organization so as to permit the membership to attend meetings and to express their views and otherwise exercise their rights as members. There shall be no limitation on the right of any member to be heard at any such separate meeting provided herein on all matters which apply to the general membership, but such member shall be permitted to vote only at such separate division, craft or place of employment meeting to which he has been assigned.

The Executive Board, pursuant to Article 18, currently holds its membership meetings, including those at which amendments to the bylaws are considered, at the Union hall, located at 4217 S. Halsted Street, Chicago, Illinois. Plaintiffs do not specifically attack the Union's By-Laws, but instead challenge the practice or policy of not permitting By-Law-sanctioned regional meetings or non-prohibited mail balloting. In light of Local 710's large geographical jurisdiction and a membership dispersed throughout that area, the Union's in-person Chicago voting requirement allegedly places an unequal and unreasonable handicap on the voting and participation rights of members living and working significant distances from Chicago.

Although the district court forbade discovery in this case and Local 710 refused to release information regarding the dispersion of its membership (R. Item 14; Def.Br. 7), plaintiffs submitted various affidavits and petitions and estimates, summarized below, concerning the location of the membership which defendant did not directly contest below or on appeal. Defendant Local 710 of the International Brotherhood of Teamsters is composed of approximately 15,000 voting members including long-dis-

tance and local drivers, dock-hands and warehouse workers. Almost all Local 710 members live and work in a four-state area including Illinois, Wisconsin, Indiana and Iowa, although some Local 710 members live as far away as New York and Texas. Plaintiffs estimate that 25 percent to 40 percent of the membership live and work more than 100 miles from the Union hall in Chicago. A petition drive directed at obtaining regional meetings or mail ballots which took place in late 1982 and early 1983 garnered signatures of 433 members who lived over 250 miles from Chicago (Pltf. Br. 11). An affidavit submitted by one plaintiff contained a summary solely of United Parcel Service employees' (and Union members') geographic dispersion and revealed that 3,100 employees live more than 100 miles from Chicago, and 1,900 members live 150 miles or more from Chicago, 390 members more than 200 miles from Chicago, and 270 members more than 250 miles from Chicago. Defendant admitted below that the Union members living more than 150 miles from Chicago make up approximately eighteen percent of the Local 710 membership (R. Item 25 at 4; Defendant's Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment). In summary, this case involves very large numbers of Local 710 members who are required to travel great distances to vote on proposed amendments to the Union By-Laws. The district court based its grant of summary judgment for defendant on plaintiffs' failure to demonstrate that the Union's policy in question has been applied in a discriminatory fashion (district court opinion at 4–5; R. Item 29). The court also denied plaintiffs' motion for summary judgment.

## II.

Section 101(a)(1) of the LRMDA guarantees in pertinent part that "Every member of a labor organization shall have equal rights and privileges within such organiza-

tion * * * to vote in elections or referendums of the labor organization * * * and to participate in the deliberations and voting upon the business of such [Union membership] meetings, subject to reasonable rules and regulations in such organization's constitution and by-laws." Section 101(b) further provides that constitutional or by-law provisions inconsistent with subsection (a) shall be of no force or effect. The purpose of the Act was to assure the "full and active participation by the rank and file in the affairs of the union." *American Federation of Musicians v. Wittstein,* 379 U.S. 171, 182–183, 85 S.Ct. 300, 307, 13 L.Ed.2d 214 (1964); see *Navarro v. Gannon,* 385 F.2d 512, 518 (2d Cir.1967), certiorari denied, 390 U.S. 989, 88 S.Ct. 1184, 19 L.Ed.2d 1294. In view of the fact that "much of the bill was written on the floor of the Senate or House of Representatives" and that the Act contains numerous "calculated ambiguities or political compromises," Cox, *Internal Affairs of Labor Unions Under the Labor Reform Act of 1959,* 58 MICH.L.REV. 819, 852 (1960); see S.REP. NO. 187, 86th Cong., 1st Sess. (1959), 1959 U.S. CODE CONG. & AD.NEWS 2318; H.REP. NO. 741, 86th Cong., 1st Sess. (1959), 1959 U.S. CODE CONG. & AD.NEWS 2424, courts have focused on the broad remedial purposes of the Act rather than on its literal language. See *Knox County Local v. National Rural Letter Carriers' Association,* 720 F.2d 936, 938 (6th Cir.1984); *Navarro,* 385 F.2d at 518.

When a union provides its membership with the right to vote on a certain matter, the right must be extended on an equal basis and in a meaningful manner, *Christopher v. Safeway Stores, Inc.,* 644 F.2d 467, 470 (5th Cir.1981); *Alexander v. International Union of Operating Engineers,* 624 F.2d 1235, 1240 (5th Cir.1980); *Bunz v. Moving Picture Machine Operators' Protective Union,* 567 F.2d 1117, 1121 (D.C.Cir.1977).[1] The statute does not

---

**1.** It does not appear that § 101(a)(1) can create a right to vote where no express provision for such vote is provided in the bylaws or constitution of a union. See *American Postal Workers*

*Union, etc. v. American Postal Workers Union,* 665 F.2d 1096, 1101 (D.C.Cir.1981); *Safeway,* 644 F.2d at 470 n. 2; *Alexander,* 624 F.2d at 1230.

permit the voting right, once granted, to be equally denied to all. *Safeway,* 644 F.2d at 470. Nor can disparate treatment of members with respect to voting rights be accomplished by adoption of bylaws or constitutional provisions that condone discrimination. *American Postal Workers Union, etc. v. American Postal Workers Union,* 665 F.2d 1096, 1104 n. 18 (D.C.Cir.1981).

Courts have recognized that facially neutral union rules or practices which nevertheless result in disparate treatment of union members and have a discriminatory effect may violate Title I. See *American Postal,* 665 F.2d at 1103, 1104, 1104 n. 17; *Alvey v. General Electric Co.,* 622 F.2d 1279, 1286 (7th Cir.1980); *Bunz,* 567 F.2d at 1122; *Gurtons v. Arons,* 339 F.2d 371, 374 (2d Cir.1964). The Supreme Court's holding in *Calhoon v. Harvey,* 379 U.S. 134, 85 S.Ct. 292, 13 L.Ed.2d 190 (1964) is in no way contrary to such an analysis. In *Calhoon* the Court merely ruled that a union member may not bring a post-election suit challenging an officer election under § 101(a)(1), since Title IV of the LMRDA provides the exclusive method by which a union member may challenge officer eligibility requirements for officer elections. 379 U.S. at 140, 85 S.Ct. at 296; see *Bunz,* 567 F.2d at 1121 n. 31. Although the opinion by Justice Black pointed out the inapplicability of Title I to the situation in *Calhoon,* noting that "complaining union members here have not been discriminated against in any way and have been denied no privilege or right to vote or nominate which the union has granted others" and that "the same qualifications were required equally of all members," 379 U.S. at 134, 85 S.Ct. at 292, this language does not limit scrutiny under Title I to cases of facially discriminatory union rules.

The fact that a union rule or practice is discriminatory with respect to voting privileges does not end the inquiry under Title I, for the statute expressly sanctions rules and regulations in an organization's constitution or bylaws that are reasonable and the Supreme Court has recently clarified that reasonableness is the ultimate inquiry in this area. See *United Steelworkers of America v. Sadlowski,* 457 U.S. 102, 111, 102 S.Ct. 2339, 2345, 72 L.Ed.2d 707 (1982). In determining the reasonableness of a union rule, this Court in *Alvey v. General Electric Co.* applied the test of reasonableness employed by the Supreme Court in Title IV cases because the rules challenged in *Alvey* were "applied to bar a group of members from voting" and this Court could "see no principled reason why that test should not also guide our inquiry in this [Title I] case." 622 F.2d at 1285. Consequently the *Alvey* court scrutinized for reasonableness in terms of "a balance between the 'anti-democratic effects' of the challenged rule and the '[union] interests urged in its support.'" 622 F.2d at 1284 (quoting *United Steelworkers of America v. Usery,* 429 U.S. 305, 310, 97 S.Ct. 611, 615, 50 L.Ed.2d 502 (1977)). Reasonableness here must also be interpreted in light of the general policy against judicial interference in the internal affairs of unions. See *Alvey,* 622 F.2d at 1285; *Rota v. Brotherhood of Railway, Airline and S.S. Clerks,* 489 F.2d 998, 1003 (7th Cir.1973), certiorari denied, 414 U.S. 1144, 94 S.Ct. 896, 39 L.Ed.2d 99.

This Court cannot agree with the district court's observation that the degree of interference allowed under Title I is less than that allowed under Title IV (district court opinion at 8, R. Item 29). This position is contrary to the holding of *Alvey,* and is not supported by the district court's reliance on *Scofield v. NLRB,* 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969). In *Scofield* the Supreme Court ruled that enforcement of a particular union rule setting a production limit on employees did not constitute an unfair labor practice in violation of Section 8(b)(1) of the National Labor Relations Act. The Court merely noted that the LMRDA does not prohibit a union from adopting and enforcing reasonable rules regarding the responsibility of its members with respect to the labor organization. *Id.* at 429, 429 n. 6, 89 S.Ct. at 1157, 1158 n. 6.

### III.

■ The defendant's policy here is much like the union rule examined in *Alvey, su-*

*pra.* As the Union points out, Local 710's policy is applied equally in the sense that all union members are equally required to come to Chicago to vote. The same observation can be made with respect to the rule in *Alvey* which permitted only union members who had paid their union dues to vote. There all members were equally required to pay dues to be eligible to vote. See 622 F.2d at 1283. But *Alvey* demonstrated the need to go beyond such a superficial inquiry and considered whether the union rule as applied resulted in disparate treatment. *Id.* at 1283, 1286. There another union rule prohibited laid-off employees from paying dues and this Court noted that "the practical effect" of the facially neutral rule limiting voting privileges to dues-paying members was to bar completely a group of workers from voting on an extremely important matter, *viz.,* the order in which laid-off employees would be recalled. 622 F.2d at 1284. Similarly, in this case the facially neutral in-Chicago voting policy as applied results in a disparate impact on a group of members, substantially impinging on their voting rights because of the great geographical dispersion of Local 710 members.

The "practical effect" or "result," 622 F.2d at 1284, 1285, of application of the Union policy is similar to the imposition of a graduated poll tax upon Union members living outside the Chicago area. The large number of members living more than 150 miles from Chicago are required to absorb significant transportation, lodging, and meal costs, (not to mention the loss of leisure or work time) in order to exercise their right to vote on bylaw amendments. These same costs are not imposed at all or only to a negligible degree upon members living near Chicago. Consequently, defendant's assertion that the Union treats all Local 710 members equally must be rejected. The fact that the Union By-Laws appear to permit this discriminatory treatment is irrelevant to this analysis. See *American Postal,* 665 F.2d at 1104 n. 18.

The primary difference between this case and *Alvey* is that the group subject to disparate treatment here is somewhat fluid and not entirely discrete. But the fact that voting rights of those living 150 miles from Chicago are not burdened as heavily as those living, for example, 200 miles from Chicago is not a valid reason for ignoring the discrimination present here.

Having determined that the Union requirement of in-Chicago voting on bylaw amendments is discriminatory, this Court's task is to evaluate the reasonableness of the policy, balancing the "anti-democratic effects" of the policy against the "union interests urged in its support." *Supra* p. 200. Although the application of the Union policy in this case does not involve a complete denial of the right to vote and participate in union affairs as was the case in *Alvey,* the in-Chicago voting requirement does impose a very substantial burden on the right to vote of a very significant percentage of the Local 710 membership. The affidavits submitted by plaintiffs testify to the impact of the policy on the members living significant distances from Chicago (Pltf. Br. 12–13). Many (and plaintiffs assert most) of Local 710's membership are not long-distance drivers but are dockhands, deliverymen and warehouse workers; thus the above-noted burdens are not minimized by the nature of the work performed by these union members.

A complete denial of the right to vote is not necessary to invoke the protection of Section 101(a)(1). See *supra* p. 199. In *Bunz, supra,* for example, a violation of Section 101(a)(1) was found where the union issued a frivolous post-election constitutional interpretation which increased from thirty-four to fifty-one the percentage of votes necessary to defeat a proposed punitive assessment on members not walking the picket line. 567 F.2d at 1122. Since the "effectiveness" of a minority of union members' votes was diminished, the D.C. Circuit held that the equal right to vote had been denied. *Id.*

The anti-democratic effects flowing from the rule are illustrated by a simple analysis of the circumstances giving rise to this action. On April 24, 1983, a vote was held

at the Local 710 membership meeting in Chicago with respect to a proposed amendment to the Union's By-Laws that would require elected union stewards. Less than 500 members attended the membership meeting, representing less than five percent of the Union membership (Pltf.Br. 12). In the 1982 election for Union officers, by defendant's own account, 1,400 Union members living 50 or more miles from Chicago requested a mail ballot and over 800 returned the ballots (Def.Br. 16). Although the Union decries the return rate of approximately fifty-seven percent, the 1983 amendment vote would have been significantly affected by the participation of even a fraction of the 800 members who returned ballots by mail in the officer election.

It cannot be denied that these union members have a significant interest in amending the bylaws of their local. See *American Postal,* 665 F.2d at 1104; *Alvey,* 622 F.2d at 1287. Here the Local 710's policy regulates the Union's voting procedures themselves with respect to all potential bylaw amendments and is not limited to one specific issue as are many of the cases finding a Section 101(a)(1) violation. See *e.g., American Postal,* 665 F.2d at 1103–04. In summary, the anti-democratic effects of the in-Chicago voting rule must be counterbalanced by some important union purpose to be viewed as reasonable.

On appeal and in its response to plaintiffs' motion for summary judgment below, defendant offered only two justifications for the Union policy. The first justification is that of cost; the Union explains that the 1982 officer election procedures, which permitted members living more than 50 miles from Chicago to request a mail ballot and which resulted in 1,400 requests for ballots, cost the Union a total of approximately $1,500 (including printing, envelopes and mailing) (Def.Br. 16; R. Item 25 at 5). Although the administrative burden of providing procedures to guarantee equality of voting certainly is a relevant consideration in this context, Congress must have recognized that increased union member participation would entail some cost. The figure

suggested by Local 710 hardly indicates that mail balloting would impose an overwhelming burden on the Union nor does defendant's argument even address any cost burden created by regional meetings.

Second, defendant suggests that a mail balloting system could create an onerous responsibility because a vote on a proposed bylaw amendment can be obtained under Article 33 of the Union By-Laws by the petitioning of only ten members (R. Item 25 at 6; Def.Br. 16). But this argument is quite speculative in view of the fact that the 1983 vote on the proposed bylaw considering the election of stewards was evidently the only such vote to occur over the last six years (Def.Br. 21). Moreover, any argument that the Union's own bylaws prevent it from providing equal voting rights runs contrary to the rule stated previously that Section 101(a)(1) violations are not rendered permissible by the mere fact that they are condoned or sanctioned by a union constitution or bylaws. See *supra* p. 200. A union rule limiting consideration of bylaw amendments to one meeting per year (a procedure that plaintiffs assert many other Teamster locals already employ; Pltf.Br. 21) or similar restrictions would not run contrary to the requirements of the LMRDA. But such limitations would not need to be included in any relief granted by the district court.

Defendant also suggests that the in-Chicago voting policy requiring personal attendance forwards the free-flow of ideas by providing a central location to discuss union business (Def.Br. 10). Although the Union certainly has a legitimate interest in promoting face-to-face discussion of issues via an in-person, central-location voting requirement, this interest is equally promoted by regional meetings. Additionally, this interest in forwarding the exchange of ideas begins to lose its legitimacy when, as here, the right to vote itself is significantly burdened by the in-person, single-location voting requirement. In summary, defendant's proposed justifications for the in-Chicago voting requirement are simply not persuasive.

■ The conclusion that the policy at issue is unreasonable is buttressed by consideration of standards developed under Title IV regulating officer elections. As noted previously, *supra* p. 200, Title IV considerations are relevant to this inquiry. Defendant's policy would not appear to survive application of the standard developed by courts for determining when multiple polling places or mail balloting are necessary for officer elections. This standard requires consideration of the following four criteria:

> (a) the number of members remotely situated;
>
> (b) the geographic areas covered by the Local;
>
> (c) whether members voluntarily assume the risk by locating outside the local's jurisdiction; and
>
> (d) whether the local uses alternative voting procedures for other important union referenda or elections.

See *Donovan v. International Association of Machinists and Aerospace Workers*, 666 F.2d 883 (5th Cir.1982); *Donovan v. United Association of Journeymen & Apprentices of Plumbing & Pipefitting Industry*, 112 L.R.R.M. 3357 (S.D.Fla. 1982); 29 C.F.R. § 452.94. The sizeable geographic area covered by Local 710 and the large number of members dispersed throughout the Local have been discussed above.[2] See *supra* p. 199. Members living outside the Local's jurisdiction are not at issue in this case, and Local 710 itself has used mail balloting for officer elections

as recently as 1982 (Def.Br. 16). Finally, defendant admits that Local 710 has held regional membership meetings in the past in order to accommodate its geographically dispersed members (R. Item 25 at 4).

The determination that the policy in question is unreasonable is also supported by the fact that other Teamster local unions with smaller jurisdictions than Local 710's provide mail ballots or regional meetings for votes on union bylaw amendment proposals (R. Item 19 at 3–4). Consequently, it is this Court's conclusion that the Union's in-Chicago personal voting requirement is an unreasonable denial of the equal voting rights of Local 710 members and constitutes a violation of Title I, Section 101(a)(1) of the LMRDA.[3] Since plaintiffs challenge only the Union's voting procedures and not a particular vote on a substantive issue, see *supra* p. 202, our ruling does not contravene the general policy against judicial interference in the internal affairs of unions. See *supra* pp. 200–201.

## IV.

The judgment of the district court is reversed and remanded with instructions to grant the plaintiffs' motion for summary judgment and fashion appropriate relief consistent with this opinion pursuant to the plenary discretion granted in Section 102 of the LMRDA, 29 U.S.C. § 412. See *Hall v. Cole*, 412 U.S. 1, 10–11, 93 S.Ct. 1943,

---

**2.** The district court cases cited by defendant which held reasonable a single location in-person voting requirement for officer elections did not involve the great degree of geographic dispersion of union members present in the instant case. See *Hodgson v. Plumbers Local Union 582*, 350 F.Supp. 16, 17, 20 (C.D.Cal.1972) (approximately five percent of members voluntarily chose to live more than 100 miles outside the union's jurisdiction); *Hodgson v. Industrial & Allied Workers & Helpers*, 327 F.Supp. 1284, 1287 (E.D.Tex.1971) (plaintiff only submitted testimony of "several" members who lived greater than 140 miles from the polling place); *Wirtz v. International Hod Carriers'*, 246 F.Supp. 741, 753 (D.Nev.1965) (eleven and one-half percent of members lived greater than eighty miles from the polling place); *Donovan v. United As-*

*sociation of Journeymen & Apprentices of Plumbing & Pipefitting Industry*, 112 L.R.R.M. 3357 (S.D.Fla.1982) (four percent of the eligible union members lived more than 110 miles from polling place). Contrast *Donovan v. International Association of Machinists and Aerospace Workers*, 666 F.2d 883 (5th Cir.1982) (cause remanded to consider justifications for union rule that prevented over one-third of membership from participating in nomination process because of members' distance from polling place).

**3.** In view of our holding with respect to Section 101(a)(1), it is unnecessary to consider whether the policy at issue also violates the rights of free speech and assembly guaranteed by Section 101(a)(2) of the LMRDA.

1948–49, 36 L.Ed.2d 702; *Knox County Local,* 720 F.2d at 938–39.