Johnnie D. STOLZ, Dean Stolz, James Barth, and Gus Flangas, Plaintiffs,

v.

UNITED BROTHERHOOD OF CARPENTERS, LOCAL UNION NO. 971, Defendants.

No. CV–84–11–ECR.

United States District Court, D. Nevada.

Feb. 20, 1987.

See also, D.C., 648 F.Supp. 1439.

Chan G. Griswold, Reno, Nev., for plaintiffs.

William A. Sokol, Michael B. Roger, San Francisco, Cal., and Nathan Jenkins, Reno, Nev., for defendants.

## MEMORANDUM DECISION AND ORDER

EDWARD C. REED, Jr., Chief Judge.

Plaintiffs bring this class action against the defendant Union on behalf of the members of the Union seeking refund of supplemental work dues (work dues) collected since January 1, 1983, under a collective bargaining agreement (CBA) between the Union and the Associated General Contractors (A.G.C.), an employer association. The CBA went into effect January 1, 1983, for a three-year period. Plaintiffs also seek declaratory and injunctive relief barring the collection of such work dues.

The parties stipulate that the Union is a labor organization representing employees in an industry affecting commerce and is the collective bargaining representative of carpenters in the northern Nevada area. Plaintiffs are members in good standing of the Union.

Jurisdiction of this Court is invoked pursuant to 29 U.S.C. § 412. A bench trial was held on December 4, 1986. Evidence and testimony were received at that time by the Court.

FACTS

On September 27, 1982, at a regularly called meeting, the members of the union rejected a proposal to impose work dues and to negotiate with A.G.C. for dues check off. Work dues to a union are payable at so much an hour by union members as they work on a monthly or other periodic basis. The union members also pay what are known as "window dues," which are flat rate monthly dues. Window dues are required to be paid by all members (including retirees), while work dues are paid only by members who are actually on the job working and receiving hourly wages.

At that time the employment conditions for the union carpenters in northern Nevada were difficult and unemployment was high. The union leadership decided to open negotiations for an extension of the CBA then in effect with A.G.C. prior to its termination. The existing contract was due to terminate the following June 30, 1983. Due to the difficult industry and labor con-

ditions it became necessary for union negotiators to settle for a freeze on certain wage and fringe benefits (which otherwise were subject to increase under the contract then in force) for the first time period to be covered by the new contract.

In the course of the labor negotiations in the fall of 1982, and notwithstanding the previous negative vote of the Union membership, the Union leadership (Executive Board) decided to seek to incorporate in the extended CBA a provision for work dues. A check off collection for the work dues was also to be sought but this was not eventually invoked on a mandatory basis (under the provisions of the extended CBA union members could voluntarily elect check off work dues as they wished). Check off in and of itself does not, therefore, appear to be a real issue of contention in the present case.

During this time, apparently due to the adverse conditions in the construction industry and the high unemployment among union carpenters, the Union was losing a substantial number of members and consequently the receipt of dues was declining precipitously. Union expenses were exceeding income by a substantial amount. By the estimates of the witnesses at the trial, the union had enough bankroll to continue in business only about one additional year unless new revenues were created.

Steps had been and were being taken internally by the Union to reduce expenses. Certain business agents were laid off, locals were merged, and other economy measures taken. As mentioned above, the Union leadership negotiating for the extension of the CBA proposed to the A.G.C. that work dues and a voluntary check off to collect them be incorporated into the extended contract. This proposal was accepted by A.G.C. and written into the contract.

Also, as mentioned above, certain wage increases and fringe benefits were to be frozen for a period of time, but the Union was able to obtain inclusion in the extended contract of a $2.50 per hour wage and fringe benefit increase, which while delayed for the first year and a half of the

extended contract would be realized to the Union members over the last year and a half of the contract.

In December of 1982, the proposed extended CBA containing the $2.50 wage and fringe benefit increase and the requirement of work dues was brought for ratification to the Union members. Members received in the mail a notice describing in general terms the changes in the contract, together with a ballot to be mailed in to the Union. The ballot permitted members only to approve or disapprove the proposed extended CBA as a whole. They could not vote on the wage increase and the work dues requirement independently. Before casting their votes, members were also invited to meetings to be conducted by the Union at Reno, Winnemucca, and Elko, Nevada, so that they could see a draft of the agreement and have it further explained to them. No union business was transacted at these purely informational meetings. One of the plaintiffs tried to propose a motion to separate the check off issue (which presumably included the requirement to pay work dues) for vote, but he was advised that he was out of order and that no such motion could be entertained or considered.

In the tough economic times the area was then experiencing, the $2.50 wage package was quite favorable as was the outlook for three years of labor harmony to enhance work prospects. The presentation of the CBA in this manner thus tempted the Union members to approve the CBA, in spite of the fact that they may not have desired to approve the requirement of work dues. The proposed extended CBA was approved by a 321–91 vote of the members and became effective January 1, 1983. The collection of work dues commenced at that time and began to be realized to the Union about three months or more later. The Union's financial fortunes as a result took a turn for the better and the Union survived.

It was necessary for the work dues to be made a part of the CBA if they were to be collected effectively, because the Union at a bare minimum had to be able to learn from the employer the number of hours

worked by each member. Otherwise, there would be no reliable way for the Union to determine the amount of dues owed. Members were permitted to elect to have the work dues collected by check off or to pay them at the window (i.e., directly to the union out of their own pockets). Even the voluntary dues check off of work dues was of considerable benefit to the Union because members found that to be the easiest way to pay the dues. Eventually over 90% of the membership elected for check off with resulting direct flow of dues to the Union, avoiding the necessity of the Union calculating, billing, collecting and accounting for payment of dues by individual members. The employer either withheld (for those electing check off) and paid the work dues to the trustee of the health and benefit plan under the CBA for payment on to the Union or, where no check off was authorized by the union member, advised the trustee or the Union as to the number of hours worked by the member. Where check off was not elected, the treasurer of the Union billed the member for the work dues owing and they were required to be paid at the "window." If the provision for reporting of time worked by members was not required in the CBA, the work dues would have become a matter of purely voluntary reporting of hours worked by individual members, with consequent additional problems of administration.

## DISCUSSION

Plaintiffs argue that because the union leadership included work dues in the CBA the members of the Union were denied a "meaningful right" to vote independently on the issue of work dues. By combining of the issue of work dues with the issue of the beneficial wage and fringe benefits package, they argue, the union denied them the meaningful right to vote on the issue of work dues, which is secured by the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401, *et seq.* Plaintiffs urge that members could not vote to reject the CBA because of their disapproval of the work dues requirement without losing the other substantial benefits of the contract. In addition, plaintiffs argue that retired members were allowed to vote on the CBA, which contravenes the requirements of the LMRDA.

## EXHAUSTION OF REMEDIES

The Union claims that contrary to the provisions of the "Constitution and Laws" of the Union, plaintiffs failed to exhaust administrative remedies within the Union and are therefore barred from pursuing this present action in court. It does not appear that the plaintiffs took advantage of all administrative avenues open to them in resolving their objections to the vote on the CBA. For example, they did not appeal the decision of the General President denying their appeal from the action of the Union. Instead, plaintiffs asked the General President to reconsider his decision and they thereby waived their rights of appeal. Plaintiffs argue that the subject exhaustion requirements are loosely construed simply to require giving the Union a chance to deal with problems themselves without court intervention. They argue that strict compliance with exhaustion provisions of the "Constitution and Laws" is not required, but rather that union grievance machinery must simply be given at least four months to work before members may turn to the court for relief.

Under § 411(a)(4) of Title 29, it appears that a union member must spend four months attempting to exhaust internal union remedies before he is able to file suit in the district courts. Case law indicates, however, that the grieved member must only wait that long; he need not see all internal procedures through to their ultimate conclusion if those procedures last longer than the required four months. *See Ornellas v. Oaklay,* 618 F.2d 1351, 1354 (9th Cir.1980) (union member has adequately exhausted internal remedies where the remaining appeal with the union lies beyond the four month limitation); *see also Johnson v. General Motors,* 641 F.2d 1075, 1080 (2nd Cir.1981) (exhaustion is applied by the court on a discretionary basis, and union cannot prevent claim from being litigated by providing for endless stages of review).

In the present case, the plaintiffs appear to have followed internal union remedies for an eight month period, from January of 1983 until August of that year. Thus, the plaintiffs followed the internal procedure for twice the prescribed statutory period. The fact that the internal remedies were not completely played out before suit was filed is simply not relevant under the existing case interpretations of the exhaustion requirement. *Id.* In view of this, the plaintiff's action is not barred for failure to exhaust internal remedies.

## LMRDA VIOLATIONS

Section 101(a)(3) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(3)(A), provides that the rates of dues, initiation fees, and special assessments charged to union members may not be levied or increased, except

in the case of a local labor organization, (i) by majority vote by secret ballot of the members in good standing at a general or special membership meeting, after a reasonable notice of the intention to vote upon such question, or (ii) by majority vote of the members in good standing voting in a membership referendum conducted by secret ballot.

The plaintiffs contend that the union violated the requirements of this "meaningful vote" provision by combining the two questions onto one ballot proposition, and by allowing retired members to vote.

## COMBINING ISSUES

There is little relevant case law which discusses the problem of combining two issues onto one ballot proposition under the LMRDA. The first leading case on the subject was *Sertic v. Cuyahoga, Lake, Geauga & Ashtabula Counties, C.D.C.,* 423 F.2d 515 (6th Cir.1970). In that case, whose facts bear a substantial resemblance to the present case, the union had combined the authorization to negotiate a wage increase with the authorization to place a wage assessment for union dues on the same ballot. *Id.,* at 520. By virtue of this combination, union members were prohibited from voting for or against each provision independently, and a number of them

brought suit under the LMRDA to void the results of the election. *Id.*

The Sixth Circuit found that the combination of the two propositions on the same ballot measure did violate the LMRDA. "In enacting this statute," the court first noted, "Congress intended to restore to members of labor unions the right to participate freely in the government of their union. This necessarily would include the right to vote 'yes' or 'no' on increases of dues or assessments without coercion." *Id.,* at 521. By combining the two propositions on the same measure, the court found, the union precluded a vote solely on the issue of the wage assessment, and thereby denied the union members a meaningful vote on that issue. This action the court found to be a violation of the strictures of the LMRDA, and the election was voided. *Id.*

Cases subsequent to *Sertic* have not focused on the mere combination of ballot measures in seeking violations of the LMRDA, but have looked for other factors as well. In *Sheldon v. O'Callaghan,* 497 F.2d 1276 (2nd Cir.1974), *cert. denied,* 419 U.S. 1090, 95 S.Ct. 681, 42 L.Ed.2d 682 (1974), a group of union members, relying primarily on *Sertic,* argued that their rights under the LMRDA had been violated when they were asked to approve an amended union constitution without being able to vote on each amendment individually. *Id.,* at 1280. As in *Sertic,* the plaintiffs argued that the combination of the amendments on one ballot proposition denied them a right to a meaningful vote on each of the separate planks. *Id.*

The Second Circuit indicated that it did not necessarily disagree with the principles stated in *Sertic,* but it further found that "those principles did not require the union in the instant case to submit for a separate vote each of the many interrelated provisions of the proposed new constitution." *Id.* The court found that it was unnecessary to allow a separate vote on each of the individual provisions, because "the adoption of some of those provisions and the rejection of others might have resulted in an unworkable document, and thrown the

operation of the union into confusion." *Id.* Because of the degree of interrelatedness in the provisions, therefore, the court held that the inability to vote on single provisions separately did not constitute the loss of a meaningful vote under the LMRDA. *Id.*

Other courts have expanded upon *Sheldon's* softening of the hard line *Sertic* rule. In *White v. Local 942, Laborer's International Union of North America,* 90 F.R.D. 368 (D.Alaska 1981) *aff'd in part, rev'd in part on other grounds,* 688 F.2d 850 (9th Cir.1982), a group of union members challenged ballots which combined two questions relating to dues increases on the "meaningful vote" basis described above. The court here found that the combination of the two questions onto one ballot proposition was not improper. Initially, it noted that the two questions in this case both dealt with dues increases. In *Sertic,* the court noted, the offending combination was comprised of a dues increase coupled with a wage increase. *Id.,* at 372. In that the questions in this case both involved dues increases, the court found that they were related enough such that a member was likely to vote the same way on both questions. *Id.* "Clearly," the court noted, "a much stronger likelihood exists that a member might choose to vote differently on related matters such as a dues increase and a wage increase, than on two types of dues increases." *Id.,* at 373.

In addition to the relatedness of the questions, the court found that the union had not coerced the members into voting one way on the ballot propositions. Although it did note that a separate vote on each of the proposed dues increase would have resulted in a "more precise expression of membership sentiment," the court found that the combination was not, in and of itself, necessarily coercive. *Id.* In view of the interrelatedness of the two provisions, and the lack of coercion, the court refused to invalidate this particular ballot proposition.

Mere combination of ballot propositions is thus not enough to state a violation of the LMRDA. Without a showing of coer-cion and an indication that the two propositions are unrelated, it appears that union members cannot claim that they have been denied a meaningful vote by combined ballot questions. *Id., see also Kleppick v. Pennsylvania Telephone Guild,* 631 F.Supp. 1073, 1081 (W.D.Pa.1986) (question of dues increase which would result from affiliation with larger union need not be voted on separate ballot provision); *Baker v. Newspaper & Graphic Communications Union,* 461 F.Supp. 109, 116 (D.D.C. 1978) *aff'd in relevant part* 628 F.2d 156 (D.C.Cir.1980) (combined vote on union contract upheld where union negotiating committee discussed the vote and answered questions about particular provisions for two hours before taking vote); *Ford v. Metropolitan District Council of Philadelphia of the United Brotherhood of Carpenters,* 323 F.Supp. 1136, 1138 (E.D. Pa.1970) (combination of dues increase with wage increase proper where there was no intent to mislead membership); *cf., Gilliam v. Independent Steelworkers Union,* 572 F.Supp. 168, 171 (N.D.W.Va.1983) (meaningful and informed vote not denied where members were given adequate notice as to date and subject matter of vote, and where enough time was given to reflect on issues and prepare effective support or opposition); *Davey v. Fitzsimmons,* 413 F.Supp. 670, 677 (D.D.C.1976) (package ratification does not violate LMRDA, in that each member's voting rights remain undiluted, and each member can vote for or against the contract on whatever criteria he or she chooses); and *Brooks v. Local 30, United Slate, Tile, and Composition Roofers, Camp and Waterproof Workers' Ass'n,* 187 F.Supp. 365, 368 (E.D.Pa.1960) (LMRDA not violated absent showing of intent to deceive, confuse, or mislead).

■ In view of the foregoing, the Court finds that the combination of the wage increase and the dues increase question on one ballot proposition in this case does not establish a violation of the LMRDA. Initially, as noted above, the evolving case law has required something more than the mere combination alone in order to indicate such a violation. In this case, it appears that the only objectionable act of the union

was this combination, in that there appears to have been no undue coercion by the union. It further appears that the union did not intentionally deceive the members in combining the two ballot propositions. In addition, the facts of this case indicate that the two questions were interrelated enough in nature that their combination on one ballot proposition did not constitute a per se violation of the LMRDA.

There is no doubt that the way the CBA was presented to the members for approval constituted a certain degree of coercion. The members had to vote for the work dues in order to gain the benefit of the wage and fringe benefits package and the better prospects for work which might be anticipated to follow over the expected three-year period of labor harmony. Taken in context, however, the manner in which these matters were presented to the membership appears to have ameliorated any actual coercion created by the ballot form.

There is no credible evidence that the Union intended to deceive the members in voting on the extended CBA. The members were reasonably well advised as to what they were voting on. Each member received a ballot form which explained the vote well in advance of the election. Further, as noted above, meetings were held in Reno, Winnemucca and Elko at which time the entire CBA proposal was discussed with the membership. These meetings were held solely for the purpose of informing the members of the issues in the election. The Executive Board of the Union did make the decision to seek to include work dues in the CBA without consulting the membership which had previously rejected that proposition by its vote. Nonetheless, it does not appear that the Executive Board was necessarily bound to seek such approval from the members, although the Union's counsel conceded at the trial that the Union would be obligated to follow the direction required by a resolution passed by the membership. Here, however, the problem of an overall negotiating stance appears to be somewhat different from the isolated question of work dues taken by itself. The members were deceived only in that they were not told in advance of the negotiation that would be undertaken by the Union seeking a requirement of work dues in the extended contract. Once the CBA was agreed to (subject to ratification), the union members were reasonably fully advised of everything they needed to know to vote intelligently on the CBA.

More importantly, it appears that the dues question and the wage increase question were related to each other to a significant degree. The Union argues that the issues are interrelated because without the work dues, the Union would have been unable to survive for the period over which the CBA extended, and, if there were no Union in evidence for the period the CBA covered, the contract would terminate when the Union expired. The Union reasons that if there were no Union (the Union being one of the two contracting parties), there would be no contract. Thus, the Union concludes that the package included in the CBA had to make provision for the survival of the Union for the wage and fringe benefits package obtained in the negotiation to have any meaning. One was meaningless without the other, in the Union's eyes.

On the other hand, plaintiffs argue that the Union's financial straits were not that dire at that time (although they concede that the Union could only have survived under the then current conditions about another year) and that the Union could have continued on without the work dues being included in the CBA. Plaintiffs contend that the issues were not related and that the work dues provision should have been left out of the CBA and instead submitted to a vote of the members. Alternatively, plaintiffs contend that window dues could have been increased and union expenses otherwise cut to allow the Union to survive.

Under the circumstances in which the union was operating when this ballot was voted, it appears to the Court that the two questions were interrelated enough for the purposes of the LMRDA. Clearly, without some sort of dues increase, the union would not have survived for much longer

than one year. The two questions were thus interrelated insofar as the continued existence of the union was required for there to be a CBA at all. Survival, being the first order of business, was thus a proper question to be combined with the wage increase. The Court is aware that this combination of dues increase and wage increase could be abused. Not all situations will present the unique problem of a union which must have infusions of dues to survive. Where a union is financially healthy, therefore, there would be no possible interrelatedness between a dues increase and a wage increase. In this case, however, there is such relatedness, in that the union would not have survived without the dues increase. The combining of the two questions onto one Ballot proposition in this case did not violate the "meaningful vote" requirement of the LMRDA.

## RETIRED MEMBERS

Plaintiffs also contend that the Union violated the LMRDA by allowing the retired members to vote in the election. In closing argument plaintiffs' counsel stated he felt it does not really matter if the retirees were allowed to vote or not. He views the permitting of the retirees to vote as additional evidence that the combination of the issues which were required to be voted on in ratifying the CBA was improper since the retirees were allowed to vote on inclusion of work dues in the CBA when they would not be required to pay such dues. The Court will consider this issue in that light.

The credible evidence adduced at trial indicated that retirees had not generally been allowed by the Union to vote on ratification of collective bargaining agreements. Section 42M of the Constitution and Laws of the Union provided that "[r]etired members not working at or depending on the trade for a livelihood shall not be entitled to vote on trade movements affecting wages or working conditions or on *ratification of contracts*" (emphasis supplied). This provision indicates that retirees would not be permitted to vote on ratification of the CBA. A further provision of Section 42M states that "[i]n con-

tract ratification votes only those affected by the contract shall be eligible to vote; in cases of industrial contracts the members affected may vote without regard to their length of membership." This latter provision suggests that if retirees were affected by the contract, they would be permitted to vote on it. Here, retirees were affected by the change in the CBA because contributions to the pension trust fund from which their pensions derived, and to the health and welfare fund, from which their health benefits came, would be diminished over what they would have been under the old CBA. Lessening of the contributions could affect the ability of the fund to pay pensions and to pay health benefits which were shared in by retirees. In fact, the trustees were forced by the condition of the fund to delete dental and vision benefits for several years after that time.

These provisions of the Constitution and Laws of the Union should be read in light of LMRDA, § 101(a)(3), 29 U.S.C. § 411(a)(3), as indicated by the interpretation made by this Court in its Order of October 15, 1985 (document # 26). The applicable LMRDA wording appears to require that retirees be permitted to vote on matters involved, even though the retirees were not required to pay work dues.

The LMRDA itself indicates that all "members in good standing" must be allowed to vote on matters which involve dues. 29 U.S.C. § 411(a)(3)(A). It appears that one remains a member in good standing of a union until one of two events occurs: (1) the member voluntarily withdraws from the union, or (2) the union expels or suspends the member after appropriate proceedings held pursuant to lawful constitutional or bylaw provisions. *Brennan v. Local 357, International Brotherhood of Teamsters*, 709 F.2d 611, at 615 (9th Cir.1983) (*citing Alvey v. General Electric Co.*, 622 F.2d 1279, 1284 (7th Cir.1980)); *see also* 29 U.S.C. § 402(*o* ).

■ At trial, the plaintiffs failed to indicate that the retired union members had withdrawn from membership, or that they had been expelled or suspended pursuant to some bylaw provision. Indeed, one rele-

vant union constitutional and bylaw provision appears to extend the right to vote on dues matters to all members affected by that vote. As the foregoing discussion has demonstrated, the retired union members were in the class of persons whose interests would be affected by the dues vote, in that their pensions and health benefits derive entirely from dues contributions. Therefore, the union rules not only indicate that the retirees were members in good standing, fully entitled to vote on dues matters, they go a step further and specifically enable the retirees to vote on those matters which directly affect their economic interests in the union.

CONCLUSION

It therefore appears that the election did not deprive the union members of a meaningful vote which they are entitled to under the LMRDA. As stated above, the combination of the two questions onto one ballot proposition was not unduly coercive, in that the union leadership made significant efforts to explain in detail the entire package. There was thus no coercive or deceptive atmosphere surrounding the union election. In addition, the two questions on the ballot were related, because of the union's severe financial straits at that time. If the union coffers had been full, the plaintiffs' argument regarding the lack of relatedness would be convincing. Because of the financial crisis, however, the relation between the questions is clear. Finally, the retirees were properly allowed to vote in the election. The plaintiffs have failed to demonstrate that the retirees are not members in good standing with the union. Further, the defendants have adequately demonstrated to the Court that the union's own rules and regulations allow retired members to vote on matters that directly affect them, such as dues increases, which bear directly on their financial interests. The weight of the evidence and the law thus favors the defendants.

IT IS, THEREFORE, HEREBY ORDERED based upon the foregoing, that the plaintiffs' prayer for declaratory and injunctive relief, and the plaintiffs' request refund of the work dues collected are denied. The Clerk shall enter judgment on the record for the defendants and against the plaintiffs.