**George DOBSON, Stephen Galbraith, Alan Graves, John Juback and Steven Sander, Plaintiffs,**

v.

**CHICAGO AND NORTHEAST ILLINOIS DISTRICT, UNITED BROTHERHOOD OF CARPENTERS, and International Union, United Brotherhood of Carpenters, Defendants.**

No. 88 C 6292.

United States District Court, N.D. Illinois, E.D.

Feb. 9, 1989.

Leon M. Despres, Thomas H. Geoghegan, Judith A. Teeter, Despres Schwartz & Geoghegan, Chicago, Ill., for plaintiffs.

Hugh J. McCarthy, Jr., Chicago, Ill., for defendants.

MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs brought suit for injunctive and declaratory relief pursuant to Section 102 of the Labor–Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 412, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. We rule herein on plaintiffs' motion for a preliminary injunction suspending the dues checkoff. That motion is denied because the probability of success on the merits is insufficient given the minimal degree to which the balance of harms favors granting the injunction.

## FACTS

This dispute arises out of the procedures surrounding a March 5, 1988 vote by members of defendant Chicago and Northeast Illinois District, United Brotherhood of Carpenters ("district council"). At issue was a "dues checkoff" proposal which in effect added an additional fee of 1% of earnings to the amount already deducted from the salaries of employees for basic dues. The proposal would allow three-fourths of the additional 1% to the district council and the remaining one-fourth would be sent to the local unions.

There are three legal issues. First, whether the notice provided to the members was reasonable within the meaning of the LMRDA. The plaintiffs allege the actual notice did not adequately explain that the proposal was an additional assessment and did not replace the basic dues. Second, whether voting by retirees denied the plaintiffs' rights to an equal vote. The plaintiffs allege that since the retirees were unaffected by the dues checkoff proposal, their voting violated both the LMRDA as well as the constitution of the United Brotherhood of Carpenters. And third, whether the timing of the vote denied those members who chose to work an equal and reasonable opportunity to vote. The plaintiffs allege that members who applied for work permits on the day of the vote were unaware a dues increase was pending. They also allege that the district council provided no absentee ballots and failed to hold open the polls to accommodate working members. We find an insufficient probability of success on the merits with respect to these claims to justify the proposed injunction.

## DISCUSSION

### I. The Appropriate Legal Standard

In *Roland Machinery Co. v. Dresser Industries,* 749 F.2d 380 (7th Cir.1984), Judge Posner articulated the standards to be applied in preliminary injunction proceedings. The Seventh Circuit adopted a "sliding scale" approach to the purportedly independent demonstrations of likelihood of suc-

cess on the merits and that the balance of harms favors issuance:

5. If the plaintiff does show some likelihood of success, the court must then determine how likely that success is, because this affects the balance of relative harms (point 3 above). The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor, the less likely he is to win, the more need it weigh in his favor. This is a most important principle, and one well supported by cases in this and other circuits, and by scholarly commentary.

*Id.* at 387 (citations omitted). We therefore review the probability of success on the merits and the balance of harms with a mind toward minimizing errors of two types. First, the "error of denying an injunction to someone whose legal rights have in fact been infringed," a mistake "more costly the greater the magnitude of the harm that the plaintiff will incur from the denial and the greater the probability that his legal rights really have been infringed." *Id.* at 388. And second, the "error of granting an injunction to someone whose legal rights will turn out not to have been infringed," a mistake "more costly the greater the magnitude of the harm to the defendant from the injunction and the smaller the likelihood that the plaintiff's rights really have been infringed." *Id.*

### II. Probability of Success on the Merits

The three areas of dispute, adequacy of notice, dilution of voting rights, and equal access, appear likely to be resolved in favor of the defendants. We discuss each briefly, with the knowledge that a more thorough review will be necessary in the future and there can be no certainty that these preliminary views will be fully sustained.

### A. *The Adequacy of Notice*

Whether derived from § 101(a)(1), "Equal Rights," or from § 101(a)(3), "Dues, initiation fees, and assessments," there is no question that the LMRDA provides members with a right to adequate notice of proposals pertaining to dues. The plaintiffs allege the actual notice did not

adequately explain that the proposal at issue was an additional assessment and was not a replacement for the basic dues.

The operative legal standard was enunciated in *Gates v. Dalton,* 67 F.R.D. 621 (E.D.N.Y.1975). That seminal pronouncement—quoted throughout the case law—outlines the scope of "reasonable" notice:

> the statute does not require individual written notice, nor is such an express requirement to be readily inferred from the LMRDA's legislative history.[*]
>
> \* \* \* \* \* \*
>
> More to the point, the LMRDA was designed "to insure union democracy."[*] With that in mind, it seems quite clear that a notice required under § 411(a)(3) is not "reasonable" unless it descends to particulars, and the ordinary union member, attentive to the interests he has at stake in such a situation, is, in some manner, thereby made aware of the specific issue to be voted upon a reasonable time in advance of the meeting.

*Id.* at 627–28 (citations omitted).

We think this standard has been met. The district council directed each local union to send written notice to each of its members, and the local unions subsequently complied. There was discussion of the new assessment at the 29 local unions themselves, at meetings of the delegates to the district council, in the newsletters sent to all the members and at special meetings of the business agents and financial secretaries of the local unions.

Plaintiffs contend that the notice was misleading because it strongly suggested merely a "change in dues structure" and not a near doubling of the individual members' dues. They claim these facts fall within the rubric of *Gates, supra,* and urge this court to rule accordingly.

The facts of *Gates* are, however, easily distinguishable from those at bar. In *Gates,* the letter of notice "simply [did] not mention a vote on June 9, 1972," *Gates v. Dalton,* 441 F.Supp. 760, 763 (E.D.N.Y. 1977), whereas here the members were well aware of the relevant date. The Gates letter also failed to mention a "specific proposal for a dues increase," *id.,* while the members here knew the dues checkoff was the issue on which the vote would be taken. The exhibits attached to the parties' memoranda cannot be interpreted to the contrary. *See* pl. exh. A (district council newsletter of February 1987); pl. exh. B (district council newsletter of December 1987); pl. exh. C (notice of special call, vote on 1% district council working dues); pl. exh. D (Pres. Vest's answers on dues checkoff).

The dues checkoff proposal was justified by the persistent recitation of new dangers facing the union (pl. exh. A ("Non-union firms have made your job ... your wages ... your conditions ... your work rules ... your benefits the targets in this struggle for union survival")). This led to persuasive appeals to defend the union's accomplishments with additional programs and funds (pl. exh. A ("The goal is this: preservation of what's been achieved and action to advance the interests of our members and their families") ("The first steps: to make sure that the District Council has the tools needed to defeat the non-union element which is creeping into our territory")); (pl. exh. B ("we must build our resources. Those who would destroy one of the last bastions of genuine trade unionism in the contruction industry ... the Chicago area ... and all of Illinois never rest")).

With this context in mind, we think that "the ordinary union member, attentive to the interests he has at stake in such a situation," was sufficiently "aware of the specific issue to be voted upon a reasonable time in advance of the meeting." *See Gates,* 67 F.R.D. at 627–28. It is hard to imagine a scenario under which the union would "take the offensive ... to build up our resources" (pl. exh. A), absent additional revenue (pl. exh. D at 3–4 ("Plans and Programs of cost to the District Council and Local Unions: 1. Elimination of strike assessment. 2. Additional expense to start and maintain Dues Check–Off, which includes additional staff, clerical personnel and computers. 3. Additional organizers. 4. Public Relations activities ... designed to emphasize value of hiring Union Carpenters. 5. Allocation to Strike Fund to reach amount deemed necessary as a base for

defensive purposes")). The union was not afraid to discuss how past successes came about: "That (achieving an eight-hour day) was a long and difficult struggle, but it was won because we provided the resources in manpower and money it takes to make progress for working people" (pl. exh. B). That the dues checkoff was not perceived as merely replacing the then-existing dues is evident from the literature of both the proponents of the measure (pl. exh. D at 2 ("Why *more* Funds are needed") (emphasis added)), as well as from its opponents (def. exh. 1 ("Even 1% is too high. The dues check-off is *in addition* to existing local dues. Since most local dues are about $400 a year, a 1% checkoff would double the amount of dues paid by a full time working carpenter")). The notice was therefore reasonable within the meaning of LMRDA.

### B. *Retirees and the Members' Right to an Equal Vote*

The plaintiffs also allege that since the retirees voted on the dues checkoff but were unaffected by it, their voting violated both the LMRDA as well as the constitution of the United Brotherhood of Carpenters.

The argument with respect to the LMRDA is that retirees dilute the rights of dues paying members to an equal right to vote. Plaintiffs attempt to bring this claim pursuant to the prohibitions of both the equal rights provisions, 29 U.S.C. § 411(a)(1), and also the more general discussion of dues, *id.* at § 411(a)(3). They concede the statutory language itself does not preclude retirees from voting, but hope to persuade us that "Congress assumed that only dues-paying members would be voting on a dues increase, even if it did not expressly say so" (pl. mem. at 11).

With this, neither we nor other courts agree. The LMRDA addressed the rights of retirees by including them within the definition of "member" and "member in good standing."

(*o*) "Member" or "member in good standing," when used in reference to a labor organization, includes any person who has fulfilled the requirements for membership in such organization and who neither has voluntarily withdrawn from membership nor has been expelled or suspended from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization.

29 U.S.C. § 402(*o*). Retirees meet this definition. *See, e.g., Stolz v. United Brotherhood of Carpenters, Local Union No. 971,* 655 F.Supp. 192 (D.Nev.1987) (holding that permitting retirees, as members in good standing, to vote on work dues provision was proper because their interests were affected); *see also* Isaacson aff. at ¶ 23. The relevant provisions of the LMRDA therefore *required* that retirees be given the opportunity to vote. *See id.* at § 411(a)(1) ("Every member ..."); *see also id.* at § 411(a)(3)(A) ("majority vote by secret ballot of the members in good standing"). § 411(a)(3)(B) ("majority vote of the members in good standing").

This conclusion leaves only a very brief discussion of the union's own constitution. Plaintiffs claim that the district council violated Section 42–M of the constitution of the United Brotherhood of Carpenters. In relevant part, it states:

Retired members not working at or depending on the trade for a livelihood shall not be entitled to vote on trade movements affecting wages or working conditions or on ratification of contracts.

We do not think this provision should be interpreted to prohibit the voting of retirees on the dues checkoff issue. The constitution limits only the rights of those members to vote on matters affecting wages, working conditions, or the ratification of contracts. The issues of dues and assessments are conspicuously absent from this list. To the extent that plaintiffs read into the intent of the provision, they are rebuffed in the same way that their looking beyond the words of the §§ 411(a)(1) and 411(a)(3) was: the statute's definitions, when combined with relevant statutory provisions, require that retirees be given the opportunity to vote.

### C. *Timing and the Equal and Reasonable Opportunity to Vote*

The third and final dispute is whether the timing of the vote denied those members

who chose to work an equal and reasonable opportunity to vote. Plaintiffs allege that some 2,000 to 8,000 members worked on the day of the vote and that "many members" applied for work permits unaware that a dues increase was pending (pl. mem. at 12). They allege that the district council provided no absentee ballots and also failed to hold open the polls to accommodate working members.

Plaintiffs almost exclusively rely upon *McGinnis v. Local 710*, 774 F.2d 196 (7th Cir.1986). We question that reliance. In *McGinnis*, the Seventh Circuit held that where a union chose to open only a single polling place, either absentee ballots or regional meetings were required for members who lived more than 150 miles from the union hall. *Id.* at 201–03. The union could not impose such a "very substantial burden on the right to vote of a very significant percentage of the Local 710 membership." *Id.* Here, however, there were some 29 polling places and only a small percentage of the membership was inconvenienced. The issue therefore appears to return to the reasonableness of the notice: were that notice reasonable—and we hold it was—then those who chose to work made their own choice. It cannot be argued that the choice between voting and working on Saturday is so coercive as to be a "substantial burden on the right to vote." *Id.* No matter when the vote was scheduled, the plaintiffs could contend that the right to vote of some members was being burdened.

Put succinctly, *McGinnis* cannot be read so as to require the mailing of ballots to those members who choose to work on the date of the vote, nor can it be read to require the vote be taken on a particular day, *e.g.*, Sunday, or during particular hours. Plaintiffs provide us with insufficient legal support to conclude that the "anti-democratic" effects of the four-hour Saturday vote renders the union's actions unreasonable.

In addition, it appears that only 701 work permits were issued for the day of the vote (Isaacson aff. ¶ 24). Of these 701 individuals, several voted nonetheless. *Id.* at ¶ 25.

Some 236 of these covered four or less hours of work, *id.* at ¶ 24. And most importantly, even had all 701 of the individuals to whom work permits were issued decided to vote against the measure, the proposition still would have passed because the margin of victory was 877 votes. *Id.* at ¶ 26.

### III. The Balance of Harms

We now return to the analysis established by Judge Posner in *Roland Machinery*. Were the plaintiffs to establish that the balance of harms overwhelmingly favored the granting of a preliminary injunction, this small probability of success might be sufficient. But we do not see much in the way of injury to either side. The plaintiffs have marshalled the appropriate cliches, that the loss of voting rights is a *per se* irreparable injury. And the defendants have paraded numerous logistical fears before us: the district council is running out of money with which to organize workers and adjust grievances, the membership would be confused, *et cetera.*

Given the lack of probable success on the merits, we conclude that the degree to which plaintiffs' harms are irreparable is insufficient. It is no doubt true that the loss of voting rights is the type of injury for which injunctive relief was intended. But here two circumstances conspire to warrant denial of that relief. First, the probability of success is quite small. And second, the alleged denial of voting rights was not with respect to a relatively unquantifiable issue, *e.g.*, the election of directors and officers. The contested issue was a dues checkoff, a quantifiable fee. In the event that the plaintiffs succeed on the merits, a new election would be held and monetary damages would appropriately compensate these plaintiffs for the assessments incurred after the original vote.

### CONCLUSION

For the foregoing reasons, plaintiffs' motion is denied.