Anthony GILLIAM, Individually and as a member of ISU; Stephen Baumann, Individually and as a member of ISU; and John W. Gregory, Individually and as a member of ISU, Plaintiffs,

v.

INDEPENDENT STEELWORKERS UNION, Defendant.

Civ. A. No. 83–123–W.

United States District Court, N.D. West Virginia, Wheeling Division.

Sept. 30, 1983.

James D. McNamara, Steubenville, Ohio, Staughton Lynd, Youngstown, Ohio, Arthur Z. Schwartz, New York City, and Allan N. Karlin, Morgantown, W.Va., for plaintiffs.

Peter Rich, David Robertson and William Kiefer, Weirton, W.Va., for defendant.

## MEMORANDUM OPINION AND ORDER

MAXWELL, Chief Judge.

### FACTUAL BACKGROUND

In March of 1982, National Steel Corporation announced that it would no longer make capital investments in its Weirton Division facility, a fully integrated steel mill producing tin plate, galvanized sheet, and hot and cold rolled sheet steel. The Weirton mill is the largest single private-sector employer in West Virginia, and its economic impact spreads across a three state region.

National's announcement presumably meant the Weirton plant would be downsized from 7,000 to 8,000 employees currently to a finishing operation employing 2,000, or less. Several options were immediately apparent, but the one which has been most actively pursued is employee ownership of the Division's facilities.

Shortly after the announcement by National Steel, two of the unions representing employees at Weirton Division joined management employees to form the Weirton Joint Study Committee to investigate and determine the course of transition to a proposed employee ownership. Utilizing funds from a grant by the State of West Virginia, from contributions by the unions and management employee groups, and from gifts by community organizations, the Joint Study Committee hired a series of consulting firms to advise on such issues as economic feasibility; the structure of a new corporation and an employee stock ownership plan (ESOP); negotiations with prospective financiers; and negotiations with National on terms of sale.

The interim between National's announcement to "downsize" the Weirton Division in March, 1982, and the present has been filled with constant activity directed toward structuring an employee buy-out. A team of negotiators spent literally months arranging the terms of purchase of the physical plant, inventory, liabilities, leases on equipment, and other portions of the Weirton Division. Accounting firms audited National's pension benefits plan and other labor costs for the Weirton Division and worked with the Joint Study Committee to devise a compensation package for the proposed company. A law firm advised the committee on developing the ESOP structure, which is viewed as key to the success of the proposed venture. The unions conducted collective bargaining negotiations with Weirton Division personnel who were to assume management positions in the proposed company, and developed terms for a new contract.

This Court has frequently been involved as civil actions have been filed challenging the legality of the proposed amendments to National's pension and severance pay plans; the structure of the Joint Study Committee; Union voting rights, and the decision not to reveal all of the confidential statistical data utilized by economic consultants.[1]

---

1. Other civil actions in this district which concern the proposed employee buy-out of the Weirton Division of National Steel Corporation include *Gregory v. Independent Steelworkers Union*, CA No. 82–65–W (filed July 13, 1982); *Baughman v. Bish*, CA No. 82–90–W (September 23, 1983); *Sutton v. Weirton Steel Division*, CA No. 83–35–W (filed March 30, 1983); *Dhayer v. Weirton Steel Division*, CA No. 83–36–W (filed April 8, 1983); *Brunner v. National Steel Corp.*, CA No. 83–40–W (filed April 13, 1983). The Court has liberally drawn from the factual background provided by the records developed in these other actions to aid its decision in the instant civil action, believing that common law principles of judicial notice as well as Rule 201, Federal Rules of Evidence, permit it to do so. *See Kinnett Dairies v. Farrow*, 580 F.2d 1260, 1277 n. 33 (5th Cir.1978).

Unfair labor practice charges were also filed with the National Labor Relations Board. To date, the work of the Joint Study Committee has been approved in all forums where challenges were mounted.

Employees not included in the twenty-six member Joint Study Committee were kept informed of the process through newsletters and frequent meetings. Starting as early as March, 1982, dozens of meetings were organized by the Committee to explain various aspects of the activities; give individuals an opportunity to pose questions, and collect employee opinion and comment. Meetings were also conducted by the unions for their membership and by various employee groups among salaried personnel.

Before the proposed employee buy-out could be implemented, existing collective bargaining agreements with National Steel had to be amended and new contracts with the proposed employer had to be approved. For both the Independent Steelworkers Union and the Independent Guard Union, that meant a ratification vote for the full membership. In addition, union members were to be given an opportunity to approve the terms of an ESOP, which (if the new venture is successful) will provide for the ownership of common stock by employees.

Central to the dispersal of information on the proposed employee-owned venture was the preparation of a so-called "disclosure document," which was published August 19, 1983. This eighty-six page publication detailed all the major aspects of the proposed company, such as the corporate structure of the new company; the formation and operation of the ESOP; projected business operations and product lines; the terms of purchase from National; changes in benefits programs for all types of employees; and summaries of the proposed collective bargaining agreements between the unions and the new company.

The date for the ratification votes for both unions was set for September 23, 1983, almost five weeks following distribution of the disclosure document. In the interim, the Independent Steelworkers Union produced a thirty-nine page publication for hourly workers which describes the issues set for voting, the meetings scheduled to explain the issues, a sample ballot, and describes those contract provisions in the proposed labor contract (including pension and other benefit plans) which constitute changes from the existing agreement with National. A similar publication, consisting of about 60 pages, was prepared for Independent Steelworkers Union salaried division members. A copy of the appropriate publication was mailed to each member. Six membership meetings were held in large meeting halls in Steubenville, Ohio, and Weirton, West Virginia, and at least 41 plant and office meetings have been conducted by union leaders since the release of the disclosure document and negotiation of the labor agreement. The Union president has stated that, "(n)o meeting was adjourned until each and every question posed by any member had been answered."

At the six special membership meetings held September 12, 13, and 14, it was announced to those in attendance that a complete work copy of the proposed labor agreement would be available for inspection and copying at the union hall by any member. By September 20, 1983, only Plaintiff Baumann had requested an opportunity to inspect the complete contract. Mr. Baumann was supplied with a full copy on the day he initiated his request.

It was in this atmosphere—seven days before a vote, orchestrated by activities set in motion many months ago—that Plaintiffs filed the instant complaint on September 16, 1983. The prayer for relief contains two simple elements: (1) Disseminate copies of the proposed collective bargaining agreement to the membership, and (2) enjoin the Defendants from conducting the ratification vote until copies of the agreement have been disseminated. (Plaintiffs also seek an award of their expenses and the costs of this action.)

The Court conducted a hearing on Plaintiffs' motion for preliminary injunction on September 20 and 21, 1983. Following argument of counsel and reception of several exhibits, the Court orally denied Plaintiffs'

motion, and granted a motion to dismiss by Defendants which had been filed on September 20. (The Court retained jurisdiction over the matter, however, to explore the potential for relief to Defendants pursuant to Rule 11, Federal Rules of Civil Procedure.) This opinion and order results from the Court's promise to memorialize the reasoning behind the disposition of the substantive issues raised.

## DISCUSSION OF LAW

Before denying the type of extraordinary preliminary injunctive relief requested, the Court examined the facts adduced in light of four factors. These are: (1) Plaintiff's likelihood of success on the merits in the underlying dispute; (2) whether Plaintiffs will suffer irreparable injury if interim relief is denied; (3) the injury to the Defendants if the injunction is granted; and (4) the public interest. *North Carolina State Ports Auth. v. Dart Containerline,* 592 F.2d 749 (4th Cir.1979); *Blackwelder Furniture v. Seilig Manuf. Co.,* 550 F.2d 189 (4th Cir. 1977). These factors have been held to be appropriate considerations in the context of union election situations. *See, e.g., Crowley v. Local No. 82,* 679 F.2d 978, 994 (1st Cir.1982).

## LIKELIHOOD OF SUCCESS ON THE MERITS

As will be discussed more fully *infra,* Plaintiffs' prayer for relief was either fully or substantially satisfied before the complaint was filed. Nonetheless, examination of the legal issue raised is important to the Court's disposition of Plaintiffs' request for preliminary injunctive relief.

■ Ratification of a collective bargaining agreement is an internal union affair. Courts should not interfere in internal union affairs at the behest of certain members when the judgment of the union's leadership appears to be fair and reasonable. *See Blanchard v. Johnson,* 532 F.2d 1074, 1078 (6th Cir.1976), *cert. denied,* 429 U.S. 869, 97 S.Ct. 180, 50 L.Ed.2d 149 (1976). *Kahn v. Hotel & Rest. Emp., etc.,* 469 F.Supp. 14, 19 (N.D.Calif.1977), *aff'd,* 597 F.2d 1317 (9th Cir.1979).

Plaintiffs' state their cause of action is based on 29 U.S.C. § 411 (union members bill of rights) and the right to a "meaningful and informed" vote found by some courts to be inherent therein. *See, e.g., Daniels v. Nat. Post Office Mail Handlers,* 454 F.Supp. 336, 339 (E.D.Va.1978). Counsel agree that there is no authority for the proposition that union members must have access to the exact wording of a proposed labor agreement prior to a ratification vote. Judicial statements in dicta indicate that leaflets, letters, or other summary-type documents are satisfactory to inform union members on the issues in collective bargaining agreement ratification votes. *See Ford v. Metropolitan District Council of Philadelphia,* 323 F.Supp. 1136 (E.D.Pa.1970). Indeed, it would appear that some ratification votes are set after quick membership meetings are utilized to present an oral explanation of new contract provisions. *See Baker v. Newspaper & Graphic Communications,* 461 F.Supp. 109, 112 (D.D.C.1978). The strongest authority offered by Plaintiff is found in *Christopher v. Safeway Stores, Inc.,* 476 F.Supp. 950 (E.D.Tex.1979), *aff'd,* 644 F.2d 467 (5th Cir.1981), where the district court suggested that the right to a meaningful vote on significant changes proposed for a labor agreement includes the obligation of union leadership to supply written information on the "pros and cons" of the proposal. Such requirement would seem to be satisfied by the summary publications produced by Defendants.

■ The Court is of the opinion that an appropriate test when a union's denial of a "meaningful and informed" vote is suggested would be: (1) Whether the members were given proper and adequate notice of the vote as to date, time, and scope or subject matter of the vote; (2) whether the information releases of the union, together with any meetings conducted, were adequate to inform the membership of the issues to be decided; (3) whether there was enough time given for adequate reflection on the merits by the members; and (4) whether there was enough time and opportunity to mount effective support or opposi-

tion to the leadership's position. The need for more information and time would vary with the complexity and quantity of issues to be decided.

This Court is hesitant to establish a rule that all union contract ratification votes require presentation to the membership of the full, exact wording of the complete labor agreement prior to the vote. The Court believes that such requirement is not necessarily critical to the provision of a "meaningful and informed" vote.

Nor is it likely that the Court should impose such a requirement on an ad hoc basis for this Union and this particular ratification vote. The Court recognizes the importance and complexity of the issues before the Independent Steelworkers Union on September 23, 1983. However, on the record developed thus far, it is difficult to conceive that Plaintiffs would succeed on the merits.

For members of the Defendant Independent Steelworkers Union, rank and file ratification of collective bargaining agreements was instituted by an amendment of the Union by-laws in 1979. The first labor contract affected by the new by-law was the proposed 1980 agreement between the Union and National Steel. After negotiations with the employer and approval by the Union steward body, a summary of contract highlights was prepared for the membership. The summary for the hourly division was 12 pages, and the publication for the salary division was seven pages in length. Membership explanation meetings were held on June 27 and 29, 1980, and the ratification vote was held on June 30, 1980. The exact wording of the collective bargaining agreement was reduced to final written form, printed, and distributed to the membership approximately six months after the ratification vote.

There is no doubt that the questions recently presented to the Independent Steelworkers membership were more significant than the usual collective bargaining ratification vote. The acceptance or rejection of the employee stock ownership plan has ramifications far beyond the term of the labor contract also at issue. Though the rates of pay, conditions of work, and benefits structure in the proposed collective bargaining agreement will be re-examined and re-negotiated in just a few years, the contract with the new employer is significantly different from past agreements with National Steel in several respects. A simple comparison of the preparation for the 1980 ratification vote with the extensive program that preceded the 1983 vote, however, would indicate that the Union leadership has met the challenge. The Court's preliminary examination would indicate that the information mix arranged by the Union (publications, media releases and appearances, and membership meetings) was adequate to inform the membership of the issues; and that over four weeks between notice and vote was enough time for reflection on the merits and for mounting effective support or opposition. Plaintiffs have not contested the adequacy of notice.

■ In conclusion, the Court would find there is no support in the law for Plaintiff's position, and this Court is unwilling to extend federal labor law to the extent urged by Plaintiffs. Provision of the exact wording of a proposed labor contract to each member is not necessarily an indicia that a union has fulfilled its duty to provide a "meaningful and informed" vote according to the test suggested by the Court.

## IRREPARABLE HARM TO PLAINTIFFS

Counsel for Plaintiff did not suggest any irreparable harm which would flow to their clients should the Court deny the injunction requested, nor does the Court perceive any. It is the opinion of the Court that the substantive relief requested by the complaint was, by and large, provided by Defendant before the complaint was filed. This was accomplished when the Union announced that a work copy of the proposed labor contract was available for viewing by any member at the Union hall prior to the ratification vote. In addition, Union President Walter F. Bish has stated that the summary publications mailed to each member describe "every substantive contractual

provision in the proposed collective bargaining agreement which constitutes a change from the existing 1980 labor agreement . . . with . . . National Steel. The summary also describes every benefit change from the existing pension and insurance benefit agreements with National. By considering the summary together with the 1980 labor agreement, each member has, in effect, a complete description of the substance of the proposed collective bargaining agreement."

The Court recognizes Plaintiffs' position (as revealed at oral argument) that each member of the Union should be provided with his or her own copy of- the exact wording of the proposed labor agreement. However, the Court does not believe that *irreparable* harm flows from asking those members who desire to view the entire, full contract to travel to their union hall to do so.

## INJURY TO DEFENDANTS AND THE PUBLIC INTEREST

In the Court's view, the major substantive relief prayed for in the complaint is the dissemination of copies of the proposed collective bargaining agreement to the membership, which was accomplished before the complaint was filed. However, at the hearing it became apparent that Plaintiffs desired each member to have a copy in hand and to have the scheduled ratification vote delayed until such time as this could be accomplished. If such injunctive relief were ordered by the Court, the Defendant's minimum costs would be for printing and distribution of the proposed labor agreement; arranging for the rental of voting machines and facilities for conducting a rescheduled election; and printing and mailing costs to produce a new notice for the rescheduled vote and any explanatory material that might be necessary.

Unfortunately, the minimum injury to Defendants would not stop with the officers of the Union, or even the rank and file membership. The Joint Study Committee and the consultants retained to assist may have to undertake considerable efforts to insure that financial arrangements and other details can be postponed. As earlier mentioned, the steel mill's economic influence pervades the Weirton community and the surrounding region. The uncertainty and anxiety felt since National's March, 1982, announcement concerning its future plans for the Weirton Division would be extended by any delay in the scheduled votes by members of the two unions. The maximum injury that could occur to Defendants and others that would automatically be affected by the relief desired by Plaintiffs includes the real possibility that a delay in the ratification vote could cause some insurmountable problem with the complex mechanism developed for the proposed employee buy-out. This would be a disasterous blow to the economic welfare of an entire region, and it is the opinion of the Court that the public interest would not be served in risking such a possibility to satisfy the desires of the three Plaintiffs.

## INJUNCTIVE RELIEF NOT WARRANTED

In conclusion, the Court would find the likelihood of Plaintiffs' success on the merits is quite limited; that the balance of equities between injury to Plaintiffs if the injunction is denied and injury to Defendant if the injunction would be granted weighs very heavily against issuing the injunction sought, and that the public interest mandates extreme caution in considering any delay in the ratification vote Defendants seek to forestall. In these circumstances, a grant of the relief sought is not warranted.

## DISMISSAL

When a complaint is accompanied by a motion for preliminary injunctive relief, the Federal Rules of Civil Procedure permit the Court to hear the motion and conduct a hearing on the merits at the same time in an appropriate case. *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). *Gellman v. State of Maryland,* 538 F.2d 603, 604 (4th Cir.1976). This is an appropriate case, and statements of counsel at the hearing indicate the parties agree.

Denial of preliminary injunctive relief effectively ends this civil action. The vote scheduled for September 23, 1983, has been conducted and Plaintiffs can no longer seek to delay it for any reason. Any future attempt to seek judicial relief in any way related to the ratification vote will most likely require totally new pleadings. There is no reason to retain this complaint on the docket.

A case which is found to be totally lacking in basis is subject to summary dismissal as frivolous. *See Dry Creek Lodge, Inc. v. United States,* 515 F.2d 926, 935 (10th Cir.1975). At this time, the Court will not express an opinion on whether Plaintiffs' filing of this lawsuit was frivolous. The Court has established a schedule of briefing of issues that might be raised under Rule 11, Federal Rules of Civil Procedure, which, hopefully, will enable the parties and the Court to fully explore this area of the law. In the meantime, the complaint will be dismissed for reasons stated above.

ORDER

The foregoing constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Federal Rules of Civil Procedure. Upon the reasoning stated herein, it is

ORDERED that Plaintiffs' motion for a preliminary injunction is DENIED. It is further

ORDERED that Plaintiffs' Complaint is DISMISSED on the merits, but the civil action shall be maintained on the active docket for limited further proceedings as noted.