Lawrence M. FARKAS, et al., Plaintiffs,

v.

Anthony RUMORE, et al., Defendants.

No. 91 Civ. 7636 (LLS).

United States District Court,
S.D. New York.

March 10, 1995.

Louie Nikolaidis, Lewis Greenwald Kennedy Lewis Clifton & Schwartz, P.C., New York City, for plaintiffs.

Lewis Rosenberg, Barry I. Levy, Shapiro Shiff Beilly Rosenberg & Fox, New York City, for Anthony Rumore, Soft Drink and Brewery Workers Union, Local 812, Intern. Broth. of Teamsters.

Mitchell Berns, Weisberg & Berns, New York City, Henry A. Platt, Schmeltzer, Aptaker & Shepard, P.C., Washington, DC, for Coca–Cola Bottling Co. of N.Y., Inc.

Paul M. Heylman and Henry A. Platt, Aptaker & Shepard, P.C., Washington, D.C., for defendant employer the Coca–Cola Bottling Company of New York, Inc.

### MEMORANDUM AND ORDER

STANTON, District Judge.

Union members brought this action under section 101(a) of the Labor–Management Re-

porting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a), and section 301(a) of the Labor–Management Relations Act ("LMRA"), 29 U.S.C. § 185(a), claiming that their local union unlawfully obtained ratification of a proposed collective bargaining agreement, and that their employer participated in the union's misconduct. They also allege that the employer violated the collective bargaining agreement by discharging plaintiff Farkas without just cause and that the union violated its duty of fair representation by mishandling his termination arbitration. They seek damages, a judgment declaring the ratification vote null and void, and reinstatement of Farkas.[1]

Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56 dismissing counts one, two, five and six of the Amended Complaint. (Counts three and four were dismissed with prejudice by order dated April 27, 1993.) Because the first and second counts (the contract ratification claims), on the one hand, and the fifth and sixth counts (the claims related to Farkas's termination), on the other, involve entirely different facts and analyses, they are discussed separately.

## I.

### Contract Ratification Claims

Plaintiffs are employed[2] by Coca–Cola Bottling Company of New York, Inc. ("Coca–Cola") and are members of the Soft Drink and Brewery Workers Union, Local 812, International Brotherhood of Teamsters.[3] Defendant Anthony Rumore is the local union's president.

Anticipating that their 1987–1991 collective bargaining agreement would expire on May 31, 1991, Coca–Cola and the union began negotiating the terms of a new agreement in March 1991. The union appointed a 55-person negotiating committee, whose members were to keep the general membership informed about the progress of the negotiations. (DiDio Aff., Heylman Dec. Ex. 2,

¶¶ 8–9.) The evidence whether they did so is conflicting.

At the end of the May 29, 1991 negotiating session, Coca–Cola presented its final offer for the members' vote. The members had voted to authorize a strike if there was no agreement. (*Id.* ¶ 11.) At the May 29 session, the negotiating committee members told the union that the voting should take place on May 30 and 31, 1991, in order to give all members the opportunity to vote. (*Id.* ¶ 13.) The union's Executive Board agreed. (*Id.* ¶ 15.)

Union officials gave the negotiating committee members 600 copies of the final offer for distribution at the workplaces. (*Id.* ¶ 16.) Shop stewards and committee members were instructed to post signs and to inform members, including those who were away from work, about the vote. (Russo Dep., Heylman Dec.Ex. 9, at 29, 31–32; Rosano Dep., *id.* Ex. 8, at 21; Vitta Dep., *id.* Ex. 10, at 25, 27.)

Voting took place on May 30 and 31, 1991. A union business agent, or a member of its Executive Board, visited each workplace to discuss Coca–Cola's final offer with the members and to answer questions. Some union representatives brought to the information meetings additional copies of the offer (Vitta Dep. at 43; Rosano Dep. at 37; DiDio Dep., *id.* Ex. 31, at 172–73), and copies of the existing collective bargaining agreement. (Russo Dep. at 65; DiDio Dep. at 172.)

The voting was conducted by secret ballot. Each member received an orange card, which he was required to fill out with his name and return in exchange for a ballot. (Affidavit of John Russo, *id.* Ex. 3, ¶ 5.) The members voted 302 to 240 to accept the offer. (DiDio Aff. ¶ 21.) This litigation ensued.

Plaintiffs contend that the voting was tainted by procedural deficiencies and that the union representatives lied to the members about the terms of the final offer in order to secure its ratification. Specifically,

---

1. A separate motion, and separate order, address a similar claim by plaintiff Regan.

2. Mr. Farkas was discharged in July 1991. He remains a member of the union.

3. Coca–Cola is an employer, and the union is a labor organization, within the meaning of the LMRA and LMRDA.

the union represented that there would be no change in the medical coverage provisions, although there were changes. The union stated that the dental plan was largely unchanged, while its benefits were severely reduced. The union told members that the flexible work week provision was no longer in the contract, but it was. The union represented that mileage pay would not apply to current drivers on the metro list, although it did apply to those drivers.

Plaintiffs assert that Coca-Cola participated in the unlawful conduct and implemented an agreement it knew had been improperly ratified.

### A. *LMRDA Claim*

Plaintiffs claim the union deprived them of a meaningful vote by failing to provide adequate notice of the vote or sufficient information about the final offer, as well as by misrepresenting the terms of the offer. They argue that this violated section 101(a)(1)[4] of the LMRDA, 29 U.S.C. § 411(a)(1), which provides:

> Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to the reasonable rules and regulations in such organization's constitution and by-laws.

The section has been read to "encompass more than just discrimination among union members." *Petrazzulo v. Lowen,* 534 F.Supp. 173, 177 (S.D.N.Y.1982); *see also Sheldon v. O'Callaghan,* 497 F.2d 1276, 1282–83 (2nd Cir.1974). A union has been required, once it has provided its members with the right to vote, to extend that right "in a meaningful manner." *See, e.g., McGinnis v. Local Union 710,* 774 F.2d 196, 199 (7th Cir.1985), *cert. denied,* 475 U.S. 1121, 106 S.Ct. 1638, 90 L.Ed.2d 184 (1986).

Courts have differed on whether a union violates section 101(a)(1) if it fails to provide adequate information in connection with an election or referendum. *Compare Brown v. International Brotherhood of Electrical Workers Local Union No. 58,* 936 F.2d 251, 254 (6th Cir.1991) (allowing claim of inadequate notice and information); *Sako v. Local Union No. 705,* 1987 WL 10981 (N.D.Ill. May 11, 1987); *Bauman v. Presser,* 117 L.R.R.M. (BNA) 2393, 1984 WL 3255 (D.D.C.1984); *Gilliam v. Independent Steelworkers Union,* 572 F.Supp. 168, 171 (N.D.W.Va.1983) *with Ackley v. Western Conference of Teamsters,* 958 F.2d 1463, 1473 (9th Cir.1992); *O'Connor v. Local 719,* 739 F.Supp. 1158, 1161 (N.D.Ill. 1990) (claim of insufficient notice of ratification vote not cognizable under section 101(a)(1)). The majority of courts allow the claim.

#### 1. Standing

■ Defendants argue that those plaintiffs who voted to reject the final offer, or did not vote, have no standing to sue because they did not rely on the union's misrepresentations. According to defendants, a union member is deprived of his rights under section 101(a)(1) of the LMRDA only if he voted in favor of the contract in reliance on the union's misrepresentations. Although the LMRDA itself imposes no such reliance requirement, defendants urge that the reliance requirement found in duty of fair representation cases be applied to plaintiffs' LMRDA claims.

That view of the rights created by section 101(a)(1) is too narrow. The LMRDA protects not only a union member's right to cast an informed vote, but also the right to debate and organize opposition to a proposed contract or referendum. *See Brown,* 936 F.2d at 254 ("The District Court must determine whether the union provided its members sufficient time and information to allow an opportunity for debate and opposition."). Thus, a member who voted against the contract or did not vote at all can still claim that the union violated his right to debate and organize opposition to the contract.

---

4. Plaintiffs appear to have abandoned their claim under section 101(a)(2) of the LMRDA, which gives union members the right to assemble freely and meet with other members. 29 U.S.C. § 411(a)(2).

Here, the plaintiffs claim the union provided no advance notice of the ratification vote, leaving little time for members to acquaint themselves with the proposal. They allege the union failed to inform members who were away from work, or who were at home on vacation, disability, workers compensation or sick leave about the vote. They also contend that at some of the workplaces the union furnished no copies of the final offer or the existing collective bargaining agreement. Because no interpreters were provided, Spanish-speaking members could not learn about the final offer at the information meetings. Thus, even apart from plaintiffs' charges that the union officials who conducted the information meetings misled the members about unfavorable provisions of the final offer, they may not have had the opportunity for a meaningful vote which section 101(a)(1) contemplates. Accordingly, none of the plaintiffs' LMRDA claims must be dismissed for lack of reliance.

## 2. Summary Judgment

Defendants contend that plaintiffs have not raised factual questions whether the members would not have approved the contract even if the union officials had accurately presented its terms, or whether Coca–Cola would have made a better offer if it were rejected. They argue that the union's procedures were reasonable as a matter of law.

■ Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Conclusory allegations are not enough to defeat a motion for summary judgment. Because plaintiffs have the burden of proof on their LMRDA claim, they must come forward with "concrete evidence from which a reasonable juror could return a verdict in [their] favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). All "justifiable inferences" must be drawn in favor of the non-movant. *Id.,* 477 U.S. at 255, 106 S.Ct. at 2513.

■ The evidence presented raises fact issues whether the union's actions deprived plaintiffs of their right to a meaningful contract ratification vote, whether the members would have rejected Coca–Cola's final offer, and whether Coca–Cola would have made a better offer.

One plaintiff, Daniel O'Leary, testified that he voted in favor of the offer in reliance on the union's misrepresentations. (O'Leary Dep., Platt Dec. Ex. 18, at 27–28.) Plaintiffs have submitted evidence of the circumstances surrounding the vote—the rushed nature of the voting and the failure to notify absent members, for example—which could allow the jury to infer that other members might also have voted differently. (*See* Gallagher Dep., Nikolaidis Aff. Ex. P, at 7; Galassi Dep., Nikolaidis Aff. Ex. T, at 21.)

Plaintiffs have submitted evidence of past practices in negotiations between the union and Coca–Cola and Pepsi–Cola, to show that Coca–Cola would have made a better offer. (*See* Foster Dep., Nikolaidis Aff. Ex. R, at 66–67; Rosano Dep. at 39.) They point to evidence that the 1991 Pepsi–Cola contract negotiation continued after the members rejected the company's offer and the existing contract expired. (Rumore Dep., Nikolaidis Aff. Ex. DD, at 101.) Summary judgment dismissing plaintiffs' LMRDA claims against the union is not appropriate.

■ By contrast, summary judgment dismissing plaintiffs' claims against Anthony Rumore is warranted. As to him, the law is that a union official may be held individually liable for a violation of section 101(a) if he "aids[,] abets, instigates, or directs a wrongful use of union power to deprive a member of his rights under § 101." *Rosario v. Amalgamated Ladies' Garment Cutters' Union,* 605 F.2d 1228, 1246 (2nd Cir.), *cert. denied,* 446 U.S. 919, 100 S.Ct. 1853, 64 L.Ed.2d 273 (1979).

Plaintiffs' claim that Rumore "coordinated and oversaw" (Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, at 45) the ratification process is not supported by admissible evidence. Rumore, who was ill, left the May 29 negotiating session before the committee members and union officials determined how and when

the ratification vote would be conducted. (Rumore Dep. at 93–95.) There is no evidence that Rumore knew of or directed the business agents' alleged misrepresentations. Accordingly, plaintiffs' LMRDA claims against Rumore are dismissed.

### B. *LMRA Claim*

■ In their second claim, plaintiffs allege that Coca–Cola violated section 301(a) of the LMRA by participating in the union's improper conduct during the ratification process and implementing the improperly ratified agreement. Section 301(a), 29 U.S.C. § 185(a), provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

Plaintiffs must show either that Coca–Cola participated in the union's practices which denied the members a meaningful vote or that Coca–Cola implemented the agreement with knowledge that it had not been properly ratified. *Contrast Kozera v. Westchester–Fairfield Chapter of Nat'l Elec. Contractors Ass'n, Inc.*, 909 F.2d 48, 54 (2nd Cir.1990), *cert. denied*, 498 U.S. 1084, 111 S.Ct. 956, 112 L.Ed.2d 1044 (1991) (trade association reasonably believed that union had power to bind its members to labor agreement addendum which had not been ratified); *Sako v. Local Union No. 705*, 1987 WL 10981, *5–6 (N.D.Ill. May 11, 1987) ("Collusion does not exist where the employer 'relies in good faith on Union actions or representations which are not obviously outside the scope of its authority.'") (citation omitted).

Plaintiffs claim that Coca–Cola managers learned which provisions of the final offer were unsatisfactory to the members and relayed that information to union officials, who then lied to the members about those provisions in order to obtain ratification. Although supervisors asked plaintiff Farkas about the contract, (*see* Farkas 1/94 Dep., Heylman Dec. Ex. 19, at 36, 43), plaintiffs have submitted no evidence that Coca–Cola officials told the union about the conversations.[5]

Similarly, plaintiffs do not support their assertion that Lou Swanson, Coca–Cola's Director of Operations, called Frank Sanchez, a supervisor at the Bronx facility, to ask why Bronx members had rejected the final offer.[6] (*See* Plaintiffs' Memorandum, at 13–14.) Finally, there is no evidence that Coca–Cola managers, who allegedly "swarmed" in the hallway outside the room in which members were voting, acted improperly. (*See* Nesmith Dep. at 45; Petre Dep., Nikolaidis Aff. Ex. G, at 66.) Considering that voting was conducted at the workplaces, the proximity of Coca–Cola managers "conducting business" (Petre Dep. at 66) does not give rise to an inference of improper conduct.

In sum, plaintiffs' LMRA claim against Coca–Cola does not present a triable issue of fact

### II.

### *Individual Duty of Fair Representation; Section 301 Claim*

Plaintiff Lawrence Farkas was employed by Coca–Cola as a tractor-trailer driver from July 1984 to July 1991. He was a member of Local 812 and was covered by the Local 812/Coca–Cola collective bargaining agreement.

### *The Trip Logs*

Work rules promulgated by Coca–Cola in 1989 required each driver to complete a daily trip report, making an entry each time he changed his duty status. ("Work

---

**5.** The deposition testimony cited by plaintiffs shows only that at one meeting, a union business agent made a telephone call to someone who "everyone in the room" assumed was Clifford Risell, a Coca–Cola vice president. (Rogel Dep., Nikolaidis Aff. Ex. H, at 68–69.)

**6.** Plaintiffs cite pages 88 and 90 of Regan's deposition in support of this assertion, but those pages were not included in plaintiffs' exhibits.

Rules/Tractor Drivers," Heylman Dec. in Support of Defendants' Joint Motion for Summary Judgment on Plaintiffs' Fifth and Sixth Causes of Action Ex. 3) [hereinafter "Second Heylman"] In 1990, Coca–Cola introduced a computerized recording system, CADEC, to replace the handwritten trip report system. The CADEC system automatically records information about the operation of a truck. It notes any time the truck is stopped for more than five successive minutes. If a driver does not enter a delay code when a stop exceeds five minutes, the CADEC system registers an "unknown stop." The CADEC system prints out a daily report for each driver, who must review and sign the report. (*See* Farkas Dep. Vol. II, Second Heylman Ex. 1, at 105.) After a training period, Farkas began using only the CADEC system in June 1990.

In March 1990, Coca–Cola distributed a memorandum which stated that "drivers who are found to be stealing overtime will be subject to the most severe sanctions available to the Company." (Memorandum from Mike Bonsignore, Second Heylman Ex. 5, ¶ 4.) Notwithstanding the memorandum, Farkas claims to have overheard Mike Bonsignore, Coca–Cola's Production Manager, tell another driver that he could stop for coffee if he made it quick. Farkas claims Bonsignore did not mention the logging requirement during the conversation. (Farkas Dep. Vol. II, at 29–30.) Farkas also claims it was a common practice among tractor-trailer drivers to make short stops without logging them on CADEC.

### The Surveillance

In 1990 Bonsignore reviewed the drivers' overtime and identified Farkas as a driver whose relatively high overtime, which is assigned by seniority, did not correspond to his relatively low seniority level. (Bonsignore Dep., Second Heylman Ex. 8, at 25–26, 104–09.) Bonsignore placed Farkas and four other drivers under surveillance. (*Id.* at 115–16.)

The detective assigned to follow Farkas reported to Bonsignore that Farkas made a number of stops which were short enough that they would not register as "unknown stops" on the CADEC system. Farkas had not logged those stops into his CADEC. (Surveillance Reports with CADEC Printout, Second Heylman Ex. 4.)

In late 1990 or early 1991 Bonsignore met with Mike Canning, Coca–Cola's Director of Labor Relations, to recommend that Farkas be discharged. (Bonsignore Dep. at 131–32.) On January 3, 1991, Farkas left work early without punching out his time card. On January 10, 1991, Coca–Cola discharged Farkas' for stealing time by failing to punch out and for making unauthorized and unrecorded stops by the side of the road. (Farkas Dep. Vol. I, at 57.)

After he was discharged, Farkas spoke with business agent John Russo, who encouraged him to file a grievance with Local 812. Farkas filled out a grievance form and delivered it to the local's office, where he encountered president Rumore and vice-president DiDio. (*Id.* at 60.) Farkas and DiDio discussed Farkas' termination, and Farkas explained that a supervisor had given him permission to leave early on January 3. DiDio promised to make some phone calls and call Farkas later. (*Id.* at 61–62.)

The next day, DiDio sent a Notice and Request for Arbitration of Farkas' termination to Howard Golob, the arbitrator designated in the contract. Coca–Cola received a copy of the request. DiDio then contacted someone at Coca–Cola and told him that Farkas had received permission to leave early on January 3. Farkas was permitted to return to work. (DiDio Dep. at 128.)

### The Arbitration

Farkas filed a grievance seeking the pay he lost before he was permitted to return to work. An arbitration hearing was scheduled for February 22, 1991. Before the hearing, Farkas met with DiDio and Local 812 counsel Melvyn Levitt; all three believed the hearing concerned Farkas' grievance. However, when Farkas, DiDio and Levitt arrived, they learned Coca–Cola was seeking to terminate Farkas' employment. (Farkas Aff., Nikolaidis Aff. Ex. JJ, ¶ 44.) The hearing was postponed to give the union time to prepare.

Another arbitration hearing was scheduled for March 28, 1991. On March 27, Farkas and Levitt met to prepare for the hearing. Sidney Fox, Levitt's partner, was designated to represent Farkas at the arbitration. They discussed the day Farkas left early (Transcript of Tape, Heylman Dec. Ex. 9, at 23–26) and reviewed a list of dates on which Coca–Cola alleged Farkas had made unauthorized stops. Farkas maintained that he had not made the stops (*id.* at 21) and suggested Coca–Cola had altered his trip report. (*Id.* at 22.) Farkas stated that he wanted to "question the validity of a trip log that the company has access to, that they can alter." (*Id.* at 35.) They also discussed the possibility of obtaining another adjournment to examine the information provided about the road stops. (*Id.* at 41–42.)

Early on the day of the hearing, Farkas and Fox met for about half an hour. They went over a CADEC printout and the notes from the previous day's meeting with Levitt. Shortly after the hearing began, Fox objected to Coca–Cola's non-compliance with the arbitrator's direction to produce documents. The arbitrator ordered Coca–Cola to produce the CADEC printout and surveillance report supporting its case and granted a recess to enable Fox and Farkas to review them. (Farkas Dep. Vol III, at 72–77; Farkas Dep. Vol. II at 203.)

Coca–Cola sought to introduce the surveillance report, and Fox objected because no witness with personal knowledge of the report was produced. The arbitrator overruled the objection. After the hearing, Fox sent the arbitrator a letter providing authority for his objection. (Letter from Sidney Fox to Arbitrator Golob dated March 30, 1991, Second Heylman Ex. 15.)

After the arbitration resumed, an employee of the surveillance company testified about the report. Mike Bonsignore testified about his comparison of the CADEC reports with the surveillance report and about his theory that Farkas tried to create overtime by stopping during his trips. (Farkas Dep. Vol. III at 111–12.)

When Farkas testified, he admitted that he had made a few stops, "i.e. to use a rest stop or to buy coffee or to check the tires." He claimed that no one had told him he had to enter such stops into the CADEC system. (Farkas Aff. ¶ 62.)

The arbitrator made an award on July 12, 1991 in favor of Coca–Cola. (Arbitrator's Award, Second Heylman Ex. 16.) Coca–Cola discharged Farkas.

*Post–Arbitration Events*

On July 26, 1991, Farkas filed an unfair labor practice charge against the union, alleging that the union violated its duty of fair representation in its handling of the termination arbitration. (Charge Against Labor Organization or its Agents, Second Heylman Ex. 17.)[7] Farkas also requested that the union seek to vacate the arbitration award, or allow Farkas to bring suit on behalf of the union, on the ground that the arbitrator based his award on information not presented at the arbitration. (Letter from Farkas to Rumore, Second Heylman Ex. 18.)

The union forwarded the letter to Fox, who requested that the arbitrator reopen the case and requested from Coca–Cola an agreement to extend the union's time to file a petition to vacate the award. (Letter from Fox to Golob, Second Heylman Ex. 20.) Coca–Cola opposed the Union's request to reopen. (Letter from Stanley Israel to Golob, Second Heylman Ex. 21.) Although the arbitrator noticed a hearing for December 16, 1991, Farkas and his individually retained attorney, Louie Nikolaidis, refused to attend "without clarification of the purpose" of the hearing. (Letter from Louis Nikolaidis to Fox, Second Heylman Ex. 25.)

Gerald Richman, a lawyer for the union, attended the hearing. Because Farkas was absent, the arbitrator granted an adjournment. Richman wrote to Farkas, stating that "it is clear that this firm is no longer capable of representing member Farkas." The hearing was rescheduled for January 24 to consider "whether the re-opening of the

---

7. After the union requested that the arbitrator reopen the award, Farkas withdrew the unfair labor practice charge.

July 12, 1991 arbitration award is proper." (Letter from Fox to Nikolaidis, Second Heylman Ex. 26.)

Nikolaidis expressed reluctance to agree to represent Farkas without further clarification regarding the "parameters" of the hearing. (Letter from Nikolaidis to Fox, Second Heylman Ex. 28.) The arbitrator replied that the purpose of the hearing was "to take such evidence as Mr. Farkas or his representative wishes to submit in support of the September 20, 1991 letter application made by counsel for the Union for a reopening of the Award and the case and rehearing of the case" as well as to "take such evidence Coca Cola wishes to submit in opposition to the said application." (Letter from Golob to Fox, Israel and Nikolaidis, Second Heylman Ex. 29.) Rumore assured Farkas that the Union would pay the fee of whatever attorney Farkas retained to represent him at the January 24 hearing. (Letter from Rumore to Farkas, Second Heylman Ex. 30.) The hearing was adjourned to February 14.

The union, Coca–Cola and Farkas, represented by Nikolaidis, appeared at the February 14 hearing. Nikolaidis stated that since the earlier arbitration hearing, Farkas had filed this lawsuit in federal court. Nikolaidis then refused to proceed with the reopening hearing, stating, "There is much evidence [about reopening the award]. The question is the context of the forum in which the discussion takes place. We feel it's inappropriate to move forward here when there is an outstanding offer [of settlement] and we're awaiting the response from the employer." (Transcript of February 14 hearing, Second Heylman Ex. 31, at 20–21.) The arbitrator then closed the hearing (*id.* at 25) and denied the request to reopen. (Opinion, Second Heylman Ex. 32.)

## DISCUSSION

Plaintiff Farkas claims the union failed to defend him adequately at the termination arbitration. Specifically, Farkas claims the union did not investigate the charges against him, attempt to secure witnesses whose testimony would bolster his, or request an adjournment to allow more time to prepare. He alleges the union breached its duty to

him because he is a member of Teamsters for a Democratic Union, a dissident group within the Teamsters union to which the union leadership is hostile. Defendants contend that Farkas lied to his union counsel about whether he had stopped by the road as Coca–Cola alleged, precluding his union attorney from formulating and preparing the defense Farkas now presses, and that Farkas failed to exhaust his administrative remedies.

Defendants contend that Farkas twice had an opportunity to present his argument that drivers were not required to log short stops by the side of the road: first, when he met with union attorneys Levitt and Fox to prepare for the arbitration hearing, and again at the reopening hearing. The first time, defendants assert, Farkas lied to Levitt, relying instead on the possible alteration of the CADEC records. At the reopening hearing, Farkas refused to proceed because he thought settlement of the entire matter, including this action, was the best course.

According to defendants, Farkas' refusal to present evidence at the reopening hearing mandates dismissal of his duty of fair representation claim because the adverse outcome of the arbitration—Farkas' termination—was not due to the union's conduct, but rather to Farkas', and because Farkas failed to exhaust his contractual remedies.

A plaintiff claiming that his union breached its duty of fair representation must show: 1) that the union's conduct was "arbitrary, discriminatory or in bad faith"; and 2) that the union's conduct "seriously undermine[d] the arbitral process." *Barr v. United Parcel Service, Inc.,* 868 F.2d 36, 43 (2nd Cir.), *cert. denied,* 493 U.S. 975, 110 S.Ct. 499, 107 L.Ed.2d 502 (1989). The plaintiff "must attempt to exhaust any exclusive grievance and arbitration procedures established by that agreement before he may maintain suit against his union or employer under section 301(a) of the Labor Management Relations Act." *Clayton v. International Union, United Automobile, Aerospace and Agricultural Implement Workers,* 451 U.S. 679, 681, 101 S.Ct. 2088, 2091, 68 L.Ed.2d 538 (1981). If the plaintiff "can show that the failure to arbitrate or the

unsuccessful result in that forum was due to the Union's wrongful conduct, that is, a breach of its duty to represent plaintiff fairly, then the judicial forum will still be open." *Young v. United States Postal Service,* 907 F.2d 305, 307 (2nd Cir.1990).

The collective bargaining agreement between the union and Coca–Cola provides:

> The Company may discharge any employee for just cause. If the Union disputes the justice of the discharge, it may refer such dispute to arbitration as provided for above. The arbitrator is empowered to sustain the discharge or to void the discharge and direct reinstatement, with or without back pay, as the merits of the case require.

(Collective Bargaining Agreement, Platt Dec. Ex. 2, Article 20.) The arbitrator's result is "final and binding upon the parties." (*Id.* Article 19.)

■ Even if the union had breached its duty of fair representation by inadequately representing Farkas at the termination arbitration, summary judgment is appropriate because Farkas failed to exhaust his contractual remedies. After the arbitrator ruled that Coca–Cola could discharge Farkas, the union filed a motion to reopen the award. The arbitrator scheduled a hearing on the motion and stated in a letter sent to Mr. Nikolaidis that the purpose of the hearing was to hear the evidence in support of and in opposition to reopening the award and rehearing the case. If Farkas had succeeded in reopening the case, he could have presented the evidence he faults the union for failing to present, and could have done so with the assistance of his own attorney. He refused to present that evidence, preferring instead to wait for the response to the offer of settlement he had made in connection with this lawsuit.

■ Farkas has not shown that his refusal to take part in the reopening hearing falls within one of the exceptions to the exhaustion requirement. The union did not prevent him from presenting evidence at the reopening hearing. *See Young,* 907 F.2d at 307 (failure to exhaust no bar to suit if plaintiff can show the failure was due to the union's

misconduct). Nor did the union delay acting on Farkas' request to vacate for an unreasonable time. *Contrast Williams v. Pacific Maritime Ass'n,* 617 F.2d 1321, 1328–29 n. 13 (9th Cir.1980) ("The inaction of the Port Committee for almost nine months and its failure to inform appellants of the reasons for the delay make appellants' attempts to invoke the grievance mechanism sufficient to satisfy the exhaustion requirement."). Farkas has presented no evidence that exhausting his contractual remedies would have been futile. *Contrast Glover v. St. Louis–San Francisco Railway Co.,* 393 U.S. 324, 330–31, 89 S.Ct. 548, 551–52, 89 S.Ct. 548, 552, 21 L.Ed.2d 519 (1969) ("[T]he court has rejected the contention that employees alleging racial discrimination should be required to submit their controversy to 'a group which is in large part chosen by the [defendants] against whom their real complaint is made.' "). Finally, Coca–Cola did not repudiate the contractual mechanism. *See Vaca v. Sipes,* 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842 (1967) ("An obvious situation in which the employee should not be limited to the exclusive remedial procedures established by the contract occurs when the conduct of the employer amounts to a repudiation of those contractual procedures."). Accordingly, summary judgment dismissing count five of the Amended Complaint is granted.

■ Count six of plaintiffs' Amended Complaint alleges that Coca–Cola violated the collective bargaining agreement by discharging Farkas without "just cause." Because Farkas' claim "is based upon breach of the collective bargaining agreement, he is bound by the terms of that agreement which govern the manner in which contractual rights may be enforced." *Id.,* 386 U.S. at 184, 87 S.Ct. at 914. Thus, Farkas' failure to exhaust the contractual mechanism provided in the collective bargaining agreement which governed his employment also requires dismissal of count six.

### CONCLUSION

Defendants' motion for summary judgment dismissing count one is denied, except for the LMRDA claim against Anthony Rumore, which is dismissed. Their motion for sum-

mary judgment dismissing counts two, five and six is granted.